538 S.E.2d 776 (2000)
245 Ga. App. 697
In the Interest of C.R., a child.
No. A00A1674.
Court of Appeals of Georgia.
August 28, 2000.
*777 Steven L. Morgan, Brunswick, for appellant.
Thurbert E. Baker, Attorney General, Jr., Shalen A. Sgrosso, Assistant Attorney General, James A. Chamberlin, Jr., Brunswick, for appellee.
MILLER, Judge.
T.R., the natural mother, appeals from the termination of her parental rights in the child, C.R. In two related enumerations of error, appellant contends the evidence is insufficient. The standard of review is whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated.[1] Viewed in the light most favorable to the juvenile court's judgment, the largely undisputed evidence adduced below authorized the following facts:
T.R. was 14 years old when C.R. was born in May 1997.[2] Because of T.R.'s age and unruly behavior, hospital personnel notified the Glynn County Department of Family & Children Services, and a safety plan was established whereby C.R. would remain with T.R.'s grandmother, where T.R. would have daily access to C.R. so she could bond with the infant and form an attachment. At a July 1997 hearing where T.R. was represented by counsel, the juvenile court determined that C.R. was deprived because T.R. was extremely immature, had no stable residence, and violated the safety plan by removing C.R. from the grandmother's care. Specifically, T.R. left her grandmother's home with C.R. one night and was essentially living on the streets, going from one place to another, staying with different people, and leaving C.R. with strangers. Temporary custody of C.R. was placed with DFACS in July, but T.R. did not meet with her caseworker to discuss a reunification plan until October, when C.R. was placed with a maternal great aunt in order to afford T.R. greater access to and more frequent contact with the child. Visits in this relative's home were irregular and marked by arguments.
In January 1998, T.R. arrived very late to the first citizen review panel meeting, and the panel members found her defensive and immature, even for a 15-year-old. The panel took the unusual step of recommending early termination. To maintain contact with C.R., the new case plan envisioned supervised visitation at the DFACS offices, one hour each Tuesday after school. T.R. would successfully complete parenting classes and cooperate with the caseworker. And T.R. promised to consider C.R.'s welfare before making any decisions that affected C.R., such as whether to have another child, whether to work on educational goals, or whether to cooperate with the case manager.
In May 1999, DFACS petitioned for the termination of T.R.'s parental rights in C.R., alleging C.R. was without parental care, control, and support because T.R. failed to obtain adequate housing and had not maintained employment, contributed to the support of C.R., visited C.R. regularly, or completed the goals of her case plan. These same circumstances underlie the additional allegation that, for the year preceding the filing of the termination petition, T.R. had significantly failed to communicate with and support the child in a meaningful, supportive manner.
At the September 1999 adjudicatory hearing, sixteen-year-old T.R. was six months pregnant with her second child. Despite the juvenile court's earlier directive to stay in school or else maintain full-time employment, T.R. did not go to school most of the time, attending only 42 days in 1998 and 55 days in 1999. At one point, T.R. used a death in the family as an excuse to skip school for more than two weeks, after which she failed to attend for the remainder of the school year and was refused enrollment for the next school year. T.R. did accept part-time employment at a fast food restaurant but was unable to work for a two-week period because her physician allegedly placed her on "bed rest." T.R. had quit a temporary job at the Jekyll Island Community Center because she did not like working "weekends and stuff." T.R. never obtained a full-time position.
T.R. frequently failed to follow through on scheduled visitations, although her aunt *778 would arrive with C.R. Out of thirty possible one-hour visits at DFACS under this case plan, T.R. actually visited with C.R. only five times. Seven times T.R. arrived, but C.R. did not because T.R. had not telephoned to confirm the visitation. T.R. does not like it when C.R. refers to the aunt as her mother, but acts immature with the child and does not treat the relationship as that of parent and child. The case manager expected T.R. to initiate a deeper kind of interaction, such as teaching C.R. a song or reading to her. In the five instances of visitation, T.R. did not always stay for the full hour. In one instance, T.R. cut the visitation short after only 15 minutes because she had an appointment to have her nose pierced. T.R. did manage to obtain a certificate of completion for parenting classes, but not a certificate of achievement, which is awarded when the instructor feels the parent will use the skills learned in the class. As for maintaining a stable residence, since C.R. was placed in foster care, T.R. has stayed at twelve different known locations, and for an eight-month period her whereabouts were unknown. T.R. had lived with her twenty-year-old sister on four occasions but was kicked out because of T.R.'s temper and because the sister felt that T.R. would never recover C.R. until she had her own residence.
T.R. leases an apartment month-to-month, for $200. Her telephone service has been shut off and not reconnected. Utilities cost approximately $60 per month. She makes $7 per hour at her part-time job at the restaurant. As to future behavior, T.R. testified that she intended to obtain her GED when she is old enough to attend adult education. But the psychological evaluation of T.R. indicated that she has an adjustment disorder with withdrawal, a learning disorder, and developmental reading disorder and will likely have difficulty motivating herself to participate in school, parenting classes, and other activities. T.R. conceded that it was not responsible to have a baby at age 14, nor to become pregnant with a second child at age 16.
1. In considering the termination of parental rights, the juvenile court shall first determine whether there is present clear and convincing evidence of parental misconduct or inability. If there is, the court shall then determine whether termination of parental rights is in the best interest of the child.[3] Termination of parental rights based on parental misconduct or inability may be authorized by the juvenile court's determination
that the child is deprived due to lack of parental care or control, subsistence, or education as required by law or as necessary for the child's physical, mental, or emotional health or morals; that such deprivation is likely to continue; and that continued deprivation will cause serious physical, mental, emotional, and moral harm to the child.[4]
In addition, where the child is not in the custody of the parent whose rights are in issue, the juvenile court shall consider whether the lack of proper parental care or control is demonstrated by proof that, for a period of one year or longer prior to the filing of the termination petition, the parent without justifiable cause failed significantly to develop and maintain a parental bond with the child in a meaningful, supportive way.[5]
2. The evidence authorizes the juvenile court's determination that C.R. is deprived because of T.R.'s inability to provide the parental care, subsistence, and education necessary for C.R.'s physical, mental, emotional, and moral development. At not quite 17, T.R. is pregnant again, unemancipated, unmarried, and has not demonstrated an ability to maintain consistent employment at even a subsistence level. The lack of proper parental care and control is further demonstrated by T.R.'s inability or unwillingness to exercise her scheduled visitations (five visitations out of a possible thirty), her inability or *779 unwillingness to take some initiative and confirm her scheduled visitations (seven visits missed because C.R. was not there), and her inability or unwillingness to use her visitations to establish a parental relationship with C.R. (such as teaching C.R. a song or a game). T.R. failed to maintain a parental bond with C.R. in any meaningful, supportive way.[6] Thus, T.R.'s reliance on Chancey v. Dept. of Human Resources[7] is misplaced.
The evidence also authorizes the conclusion that this deprivation is likely to continue or will not be remedied, since T.R. has no realistic plans to support herself, much less her two small children.[8] There is expert opinion evidence that T.R. will not, by herself, be motivated to finish school or otherwise take charge of her life. Moreover, T.R.'s second unwed pregnancy indicates that she continues to exercise poor judgment, to the detriment of C.R.[9] And the continued deprivation will likely cause serious physical, mental, emotional, or moral harm to C.R.
3. The same factors indicating deprivation due to T.R.'s parental unfitness or inability also support the juvenile court's judgment that termination is in the best interest of C.R.[10]
Judgment affirmed.
POPE, P.J., and MIKELL, J., concur.
NOTES
[1] In the Interest of W.M., 239 Ga.App. 319, 321(1), 521 S.E.2d 230 (1999).
[2] The putative father was unnamed until the adjudicatory hearing two years later.
[3] OCGA § 15-11-94(a), formerly OCGA § 15-11-81(a).
[4] (Citations omitted.) In the Interest of V.H.W., 241 Ga.App. 332, 333(1), 527 S.E.2d 30 (1999).
[5] OCGA § 15-11-94(b)(4)(C)(i). Because the first citizen review panel recommended termination of T.R.'s parental rights, we do not consider whether her failure to abide by subsequent case plans authorized termination under OCGA § 15-11-94(b)(4)(C)(iii), since such plans were not, in our view, designed to reunite C.R. with her mother.
[6] In the Interest of W.M., supra, 239 Ga.App. at 322(2), 521 S.E.2d 230. Compare In the Interest of T.B., 242 Ga.App. 564, 567(3)(b)(iii), 529 S.E.2d 620 (2000) (physical precedent only) (caseworker readily admitted that 16-year-old natural mother maintained meaningful contact, had not missed a visit, and sought additional visitation beyond one hour per week supervised by DFACS).
[7] 156 Ga.App. 338, 340(1), 274 S.E.2d 728 (1980) (whole court) (no indication that the natural mother ever engaged in misconduct detrimental to child or that she suffered from inability to care for child).
[8] In the Interest of V.H.W., supra, 241 Ga.App. at 334(1), 527 S.E.2d 30.
[9] In the Interest of J.M.B., 231 Ga.App. 875, 878(1)(c), 501 S.E.2d 259 (1998) (evidence that natural mother placed her convenience and personal ambitions before the welfare of her child authorized conclusion that deprivation would continue).
[10] In the Interest of V.H.W., supra, 241 Ga.App. at 334(2), 527 S.E.2d 30. Accord In the Interest of C.W.S., 231 Ga.App. 444, 448(4), 498 S.E.2d 813 (1998).