**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**October 22, 2012**

# In the Court of Appeals of Georgia

A12A1434. IN THE INTEREST OF M. T. F., a child.

PHIPPS, Presiding Judge.

The biological mother of four-year-old M. T. F. appeals the juvenile court order terminating her parental rights. The mother contends that the juvenile court erred in, among other things, terminating her parental rights because the evidence was insufficient. We agree and reverse.

On June 19, 2008, the Georgia Department of Human Resources Division of Family & Children Services (DFCS) filed a deprivation petition alleging that on June 15, 2008 M. T. F. was born prematurely to a mother who was a minor and in the custody of DFCS. DFCS alleged in the petition that M. T. F. was admitted at a hospital and was "without a proper parent to provide for the child as the . . . mother is a child herself who cannot provide for her own daily necessities of life and the

child has been essentially abandoned by [the] father." M. T. F. was born at 24 weeks, and, according to a neonatalogy developmental specialist, was "medically fragile." M. T. F. had multiple diagnoses, including mild cerebral palsy, because of his extreme prematurity. M. T. F. fed through a gastrostomy tube which was surgically placed through his anterior abdominal wall and into his stomach.

On July 2, 2008, the juvenile court entered an order nunc pro tunc June 24, 2008, adjudicating M. T. F. deprived and placing him in the custody of DFCS. The court ordered DFCS to prepare a plan of care for reunification and to submit it to the court to become the court-ordered case plan. The court ordered that before M. T. F. could reunite with the mother, the plan, at a minimum, shall include goals for the mother to "establish and maintain stable housing and employment sufficient to provide for the child's basic necessities of life. . . ." The adjudication and disposition order concerning M. T. F. was due to expire on June 24, 2009, but was extended to May 13, 2010, with the agreement of the mother who, according to the extension order, had recently turned 18 years old.

In accordance with the adjudication and disposition order, the case plan, which, on August 20, 2008 was signed by the mother, required, among other things, that the mother obtain and maintain a source of income/support and obtain and maintain

2

stable, clean, and safe housing. The plan required also that the mother keep all scheduled medical appointments and follow all recommendations of M. T. F.'s health care providers. The mother further agreed to receive services geared toward living with M. T. F., making sure all of his needs were met, and being a good mother. One of the goals for the mother was to graduate from high school in May 2009.

On April 14, 2010, DFCS filed a petition alleging that M. T. F. continued to be deprived and seeking to terminate the mother's parental rights. DFCS pertinently alleged in the petition that for the "past one year and ten month period of time that the child has been subject to the jurisdiction of the . . . [court], the mother continues to show a lack of maturity and demonstrated parental ability so as to provide appropriate care for the child." DFCS asserted that despite being given the opportunity to remain in foster care after she turned 18 years old, the mother chose to leave the foster care system and live with her sister who "has a history with the department." DFCS alleged that "[d]espite attending school and maintaining a job, the mother appears very immature and nonchalant as to the special needs of the subject child." DFCS claimed that the mother had made a negative comment about the child's developmental delay, had failed to follow proper procedures in maintaining the child's feeding tube, appeared to have many young people in and out of her apartment

3

at all hours, and that the mother's weekend visits with the child had stopped because the child had received injuries to his face and eye and the mother did not have a reasonable explanation for the cause of the injuries.

By order filed June 23, 2010 nunc pro tunc April 21, 2010 the court, with the agreement of the mother, extended to April 20, 2011, its order adjudicating M. T. F. deprived and placing M. T. F. in DFCS's custody.

Hearings on DFCS's termination petition were held on September 10, 13, and 16, 2010. The court suspended the termination hearings and held case review hearings in the interim. Case review hearings were held on October 20, 2010 and November 22, 2010. At the November 2010 hearing, the court set the matter for January 28, 2011, to resume the hearings on the termination petition. At the January 28, 2011 hearing, the court ordered that the mother's rights be terminated.

> In reviewing the sufficiency of the evidence supporting a termination order, we view the evidence in the light most favorable to DFCS and determine whether . . . any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost. We do not weigh the evidence or determine the credibility of the

witnesses but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[1]

Viewed in the proper light, the evidence showed the following. At the September 10, 2010 termination hearing, the neonatalogy developmental specialist testified that in September 2009, the team of medical personnel assigned to treat M. T. F. met with the family to review medical and developmental findings and speech and language issues concerning M. T. F. The psychologist and physical therapist provided instructions on home exercises and activities to improve, enhance, or facilitate communication with M. T. F. According to the physician's records, the mother had attended the team meeting in September 2009; but not the meetings in January 2010 and May 2010.

A clinical psychologist who on June 18, 2010 completed a psychological and parental fitness evaluation of the mother testified that at the time of the evaluation, the mother indicated that she was unemployed, a full-time student, and living independently. The psychologist recommended that, among other things, the mother work closely with a parent aide.

---

[1] *In the Interest of D. P. E.*, 282 Ga. App. 529, 530 (639 SE2d 535) (2006) (footnote omitted); *In the Interest of S. R. M.*, 283 Ga. App. 463 (641 SE2d 666) (2007).

The mother's DFCS social services case manager from August or September 2009 to December 2009 testified that when she was initially assigned the case, the mother had commented that she thought M. T. F. was being lazy concerning his special needs and disabilities. The case manager testified that she discussed the incident with the mother and explained the need for the mother to learn how to cope with M. T. F.'s needs. She testified that the mother had acknowledged that she had missed medical appointments and other appointments regarding M. T. F. because she did not have transportation. When the case manager handled the case the mother was a college student, unemployed and had no steady income, other than student loan money, and she received assistance from her sister. The mother had lived with her sister but obtained an apartment of her own by the time the case manager's handling of the case was about to end. DFCS had required the mother to obtain housing separate from the sister because the sister would not allow DFCS to conduct an evaluation of her home or enter her home on a regular basis.

The case manager testified that when she handled the case, the mother had completed anger and violence counseling and parenting courses, and she was complying with her case plan. She testified that the mother appeared to be loving and caring toward M. T. F.

6

M. T. F.'s foster mother, who had once had a son who was medically fragile and worked on-call on weekends at a home for medically fragile children, testified that M. T. F. had come into her care after he had been discharged from the hospital, at eight months old. The foster mother testified as to M. T. F.'s various medical and weekly therapy appointments. She testified that although the mother had attended all of M. T. F.'s medical appointments, the mother had not attended any of M. T. F.'s therapy appointments because they conflicted with her class schedule. And although the mother had not attended the therapy appointments, she asked the foster mother how they had gone, and the foster mother "showed her what's going on."

The foster mother testified that in June 2009, the mother had begun to have unsupervised visitation with M. T. F. But at one point the visitation had stopped because M. T. F. had accidentally received minor injuries while in the mother's custody. The visitation recommenced, however, just one month prior to the September termination hearing. The foster mother testified that the mother always appeared to be ready to exercise visitation with M. T. F. and that she was not aware of anything DFCS had asked the mother to do that the mother had not done. The foster mother testified that she had seen the mother interact with M. T. F. and handle his feeding tube and that, in her opinion, the mother handled the feeding appropriately

7

and that "as far as his care she knows exactly what to do." The foster mother testified that she felt the mother knew how to appropriately take care of M. T. F.

The mother testified that approximately one month before the termination hearing, she had moved into an apartment of her own that was near a child care center which could handle M. T. F.'s special needs. Before then, she had lived with her sister, with her boyfriend's mother for approximately one month, and in a different apartment for one year. The mother testified that she currently attended college and was 15 to16 months into a 3-year program. She was attending classes on Mondays, Wednesdays, and Fridays. She testified that she obtained money to go to college through scholarships, loans, and DFCS's independent living program.

The mother testified that, at the time of the hearing, she was employed by her sister as a receptionist, and had been at that job for approximately three months; she did not know, however, her rate of pay or how her pay was calculated. She testified that before then, she had worked from March 2010 to May 2010 as a shampoo assistant at a different place of business. The mother testified that about two or three weeks before the hearing, the case manager handling the case had asked her for pay stubs. The mother testified that she had brought with her to court a document drawn

up by her sister which provided her rate of pay and pay schedule. No such document is included in the appellate record from that hearing, however.

The mother testified that she had a checking account through her school, that she was no longer involved with the boyfriend, and that if she were given custody of M. T. F., the child care center near her apartment, at which she intended to enroll him, would provide the therapy that M. T. F. needed. The mother also testified that she could call a "medical van" to transport M. T. F. to his appointments free of charge.

At the continuation of the termination hearing, on September 13, 2010, Cassie Register, the case manager who was assigned the case in July 2010, testified that when the case was first assigned to her, the mother was living with her boyfriend at his mother's house. Ms. Register acknowledged that, as it concerned the case plan, the mother had completed parenting courses, anger and violence courses, that she had been working with a parent aide, that she was in constant contact with the foster parents, and that she was going to school. Ms. Register testified that "[t]he components of her case plan that [DFCS] does not feel she's completed would be [the] stable income component and the stable housing component."

DFCS tendered, without objection, prior court orders that were entered in the case. One of the orders, filed on July 19, 2010, provided for the termination of

unsupervised visitation because the mother had a live-in boyfriend who had an admitted history of criminal activity that involved the use of a gun.

DFCS rested its case at the end of the September 13, 2010 hearing. The matter was continued to September 16, 2010. At the September 16, 2010 hearing, counsel for the mother moved that the court enter a "directed verdict." The court heard argument and stated that it would not rule on the mother's motion, but would take it under advisement; in the meantime, the court stated that it desired to "set this case out a little bit. . . . bring it back maybe within 30 or 60 days. . . . to at that point review what our status is on some of our issues here."

The court stated that it wanted, among other things, more information about whether the mother's housing situation was stable, and whether the mother's employment and income therefrom were stable and sufficient to meet expenses. The court specifically ordered the mother to provide to her case worker documentation of employment and income. The court ordered the mother to attend M. T. F.'s physical therapy sessions and to get involved so that she could "get firsthand information from the therapist on whatever the things are that you're supposed to be doing with [M. T. F.] at home." The mother affirmed that she understood the court's instructions, and her attorney did not object to the court's ruling.

10

At the first review hearing on October 20, 2010, Register testified that since the last hearing (September 16, 2010), a new parent aide was assigned to work with the mother, and the parent aide told Register that the mother had canceled an appointment scheduled with her for October 6, 2010, because of the amount of time the appointment would take. Register testified that the parent aide said she had left three voice messages before receiving a return call from the mother to schedule the canceled appointment. According to Register, the parent aide said she had tried, unsuccessfully, to call the mother, who never called the parent aide to reschedule the appointment.

Register testified that the mother was not cooperative with her, either. Register also had difficulty scheduling an appointment with the mother. Register testified that the mother resisted meeting with her monthly and that the mother was not at home when Register went to her home on October 7, 2010 for a scheduled appointment. Register testified that the week before the review hearing the mother told Register that she was frustrated that Register was in her home; the mother said she felt her privacy was being invaded and she was overwhelmed with all she had to do.

Register testified that since the last hearing the mother had missed one of M. T. F.'s medical appointments. But according to the foster parents, the mother did

11

attend a therapy session for M. T. F. The mother resided at the same place she had indicated at the last hearing, a month earlier. Register testified that the mother told her that she still worked for her sister but that the mother had not provided her with proof of income. Since the last hearing, DFCS increased the mother's unsupervised visitation with M. T. F. from every other weekend to every weekend.

At the end of the hearing, the mother's attorney asked the court to reschedule the matter for another review hearing in 30 or 60 days to give the mother time to provide Register with the requested information. The court scheduled the matter for another review hearing on November 22, 2010. The court again directly addressed the mother, asking that she provide proof of income.

The following individuals testified at the November 22, 2010 hearing: the new parent aide, Register, and the mother. The parent aide confirmed Register's earlier testimony that the mother had canceled an appointment after the parent aide had left the mother three messages to schedule the appointment in the first place. The parent aide testified that she had rearranged her schedule to accommodate the mother's availability that week. Aside from that appointment, the parent aide testified that she and the mother had an appointment for November 4, 2010, and the mother called her two to three hours after the scheduled time to say that she had forgotten about the

appointment. They rescheduled the appointment for November 11, 2010, but did not meet that day, either. That day, the parent aide called the mother to tell her that she was stuck in traffic and was running approximately half an hour late, and despite telling the mother that appointments lasted about two hours (and thus, they were still within the scheduled time to meet), the mother stated that she could not meet because she had other plans. The parent aide testified that she arrived at the mother's home but she did not seek to enter because of the "manner in which [the mother] was talking to me." The parent aide testified that prior to the hearing she had met with the mother only twice.

The parent aide testified that her purpose was to help the mother budget and structure her finances to ensure that she could provide for M. T. F. As of the hearing, however, she had not received from the mother proof of income from employment, or any history of bill payments.

Register testified that since the last review hearing, the mother continued to have unsupervised visitation with M. T. F. Register testified that the mother had not attended any of M. T. F.'s therapy sessions since the last hearing. Register testified that the mother asked for an extended visitation for the Thanksgiving holidays, and DFCS approved visitation from the Wednesday before Thanksgiving Day to the

Saturday following the holidays. The mother had still not provided Register with any verifiable proof of employment or income from employment. Register explained that a document the mother had given her was not satisfactory proof of income because she could not verify receipt of the money without corresponding evidence of a checking-cash history or a history of use of the money, such as deposits and withdrawals of the money from a bank account.

The mother testified that it was not her fault that the scheduled appointment with the parent aide the day the aide was stuck in traffic did not take place. The mother testified that she waited at home for the parent aide, who had called her when she had already left her house and the appointment would have ended. The mother testified that she worked for her sister but admitted that she did not bring to court any verifiable proof of income or employment.

At the continuation of the termination hearing on January 28, 2011, DFCS moved to incorporate testimony and evidence from the October and November case review hearings. The court granted the motion.

At the January 2011 termination hearing, Register testified that after the November 22, 2010 hearing, the mother failed for three to four weeks to exercise visitation with M. T. F., beginning with the Wednesday before Thanksgiving Day.

Register testified that the mother told her that she had stopped the visitation because she was feeling frustrated. The mother also told Register, at that point, that she wanted to surrender her parental rights.

Register testified that, again, she experienced difficulty scheduling an appointment with the mother who would tell Register that she would call her back. Register testified that she had been informed by the parent aide that the mother had not returned her phone calls, either. After several phone calls, Register finally spoke to the mother who agreed to meet Register. The mother then recommenced visitation with M. T. F. on December 17, 2010, and told Register that she no longer wanted to surrender her parental rights. Register testified that the mother had maintained her housing and attendance at school, but she still had not provided verifiable proof of stable income to financially support herself and M. T. F.

At the January 2011 termination hearing, the mother acknowledged that she had called the foster parents to pick up M. T. F. the Wednesday before Thanksgiving. The mother testified that she did it because she had gotten discouraged and could no longer tolerate DFCS in her life. The mother testified that she felt there were "so many negative people [who were] supposed to be trying to help me out in my case," and that she had tried to do everything DFCS had asked of her, but "one time I have

15

a good person or someone that's trying to help me get my child back. Then the next day I have this person telling me that I'm not going to get my child back, that they don't believe me basically, that I'm not doing it right. So that's why I felt like nobody was trying to actually help me get my son back."

The mother admitted that she had missed a medical appointment for M. T. F. in December 2010. She introduced what she testified was a document her sister had generated which showed payments she had received for employment, from July 9, 2010 to September 3, 2010. Her attorney stated that a copy of the document had been previously admitted into evidence; and although at the November 2010 review hearing there appeared to have been reference to a document showing a list of payments by the sister, the appellate record does not reflect that the document was admitted as an exhibit at that hearing.

The mother testified that she had changed her class schedule, and at the time of the hearing, she was enrolled in school full-time in online classes, had obtained a driver's license, and lived at the same apartment from the time of the September 2010 hearing. The mother tendered into evidence a copy of a 12-month apartment lease that was in her name only.

The parent aide testified that she called the mother twice during December 2010 and left messages, but the mother did not return the calls. The parent aide called again on January 6, 2011 and left a message; the mother returned that call. The parent aide testified that she had met with the mother on January 16, 2011 and that it appeared to her that the mother finally understood that parenting involved more than loving a child. The parent aide testified that the mother, however, missed an appointment with her on January 25, 2011. That day, the parent aide drove to the mother's home, but the mother was not there and although at one point the mother asked the parent aide to wait for her, the mother later called back to say that she could not make it.

The mother called as a witness at the termination hearing a case manager who had handled the case from September or October 2009 to July 2010, and testified that the mother had complied with the case plan. A Court Appointed Special Advocate testified that the mother had a very good connection with M. T. F. and that there was nothing that would prevent her from being a fit and proper parent.

The mother's older brother, who lived in-state and was familiar with M. T. F., testified that he had financially assisted the mother in the past and he would continue to assist her financially and provide transportation.

The foster father testified that the mother was actively involved in M. T. F.'s life, that the mother and M. T. F. interacted very well with each other, and that the mother was very loving and caring of M. T. F. He testified that M. T. F. recognized the mother as his "mom" and that the mother seemed adequately informed and intelligent to deal with his needs.

The juvenile court found that M. T. F. was deprived because of the mother's inability to care for M. T. F., based on the following facts. The mother: 1) had failed to attend all of the child's medical appointments; 2) had not attended medical appointments designed to educate her about the child's medical condition; 3) had once commented that the child's developmental delays were as a result of him being lazy; 4) had lived with her sister who had a history with DFCS (which showed poor judgment in the mother's choice of living environment); 5) had not shown a steady stream of income; 6) had maintained a relationship with a man who had committed a crime in the past; 7) did not establish a stable place to live until one month before the start of the September termination hearing; 8) excessively relied on the foster parents; and 9) failed to cooperate with the parent aide. The court pointed out the mother's failure to exercise her extended visitation and to be involved with the child during the 2010 Thanksgiving holidays.

In considering the termination of parental rights, the court shall first determine whether there is present clear and convincing evidence of parental misconduct or inability.[2] If there is, the court shall then consider whether termination of parental rights is in the best interest of the child.[3] The court determines parental misconduct or inability by finding that: the child is a deprived child (defined in OCGA § 15-11-2 to mean a child who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals);[4] the lack of proper parental care or control by the parent in question is the cause of the child's status as deprived;[5] such cause of deprivation is likely to continue or will not likely be remedied;[6] and the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[7]

---

[2] OCGA § 15-11-94 (a).

[3] Id.

[4] OCGA § 15-11-94 (b) (4) (A) (i); OCGA § 15-11-2 (8).

[5] OCGA § 15-11-94 (b) (4) (A) (ii).

[6] OCGA § 15-11-94 (b) (4) (A) (iii).

[7] OCGA § 15-11-94 (b) (4) (A) (iv).

In determining whether the child is without proper parental care and control as set forth in OCGA § 15-11-94 (b) (4) (A), the court was required to consider any evidence that such care and control was absent, including evidence of circumstances described in OCGA § 15-11-94 (b) (4) (B),[8] which DFCS does not allege to be present here. In addition to these considerations, OCGA § 15-11-94 (b) (4) (C) provides that where the child is not in the custody of the parent whose rights are in issue, in determining whether the child is without proper care and control, the juvenile court shall consider, without being limited to, whether the parent, without justifiable cause, has failed significantly for a period of one year or longer prior to the filing of the termination petition to: develop and maintain a parental bond with the child in a meaningful, supportive manner; provide for the care and support of the child as required by law or judicial decree; and comply with a court-ordered plan designed to reunite the child with the parent.[9]

1. The mother contends that there was not sufficient clear and convincing evidence to show that she was unable to care for M. T. F. She argues that the juvenile court erroneously based its determination of parental unfitness on past unfitness alone

---

[8] See *In the Interest of S. G.*, 271 Ga. App. 776, 777 (611 SE2d 86) (2005).

[9] Id. at 777-778; OCGA § 15-11-94 (b) (4) (C).

and failed to address the issue of present parental unfitness. She further argues that the juvenile court failed to adequately consider the provisions of OCGA § 15-11-94 (b) (4) (C). We agree.

On July 2, 2008, the juvenile court entered an order nunc pro tunc June 24, 2008, finding that M. T. F. was deprived. That order was twice extended with the agreement of the mother, the last extension occurring after DFCS had filed its petition to terminate the mother's parental rights. Even so, DFCS was required to present at the termination hearing evidence of *present* deprivation, not past or potential future deprivation.[10]

> Where, as here, the child[] ha[s] been removed from parental custody, DFCS may prove current deprivation by showing that, if the child[] w[as] returned to [his] mother at the time of the hearing, [he] would be deprived. This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing.[11]

---

[10] *In the Interest of S. D.*, 316 Ga. App. 86, 89 (2) (728 SE2d 749) (2012); *In the Interest of C. L. C.*, 299 Ga. App. 729, 734 (1) (683 SE2d 690) (2009).

[11] *In the Interest of A. R.*, 315 Ga. App. 357, 363-364 (1) (a) (726 SE2d 800) (2012) (footnote omitted); see *In the Interest of P. D. W.*, 296 Ga. App. 189, 192-193 (1) (a) (674 SE2d 338) (2009).

The mother's circumstances at the time of the termination hearing were significantly different from the circumstances which caused M. T. F. to be placed in the custody of DFCS.[12] At the time DFCS opened this case, the mother was in DFCS custody, she was in high school, and she conceded that she could not provide for the care and support of M. T. F., who had lived at a hospital for the first eight months of his life and then in a foster home.

In contrast, at the time of the termination hearing, there was some evidence that the mother was employed. The evidence showed that she had established stable housing near a child care center that could provide specialized care for M. T. F., had knowledge of a medical van service that could transport M. T. F. to medical appointments, had obtained her driver's license, was a second-year college student, had enrolled in on-line college courses, had exercised unsupervised visitation with M. T. F. numerous times, attended most of M. T. F.'s medical appointments, had completed anger and violence counseling, had completed parenting counseling, knew

---

[12] See *In the Interest of T. J. J.*, 258 Ga. App. 312, 315 (1) (574 SE2d 387) (2002) (judgment terminating parental rights reversed where circumstances that had prevented mother from parenting her children since birth and contributed to children's deprivation changed significantly; mother was no longer a minor, no longer in DFCS's custody, had taken steps consistent with providing adequate care and supervision for her children, including securing employment, obtaining housing, planning a future with her children and their father, and remedying her mistakes).

how to appropriately care for her medically fragile son, and with the exception of the incident around the Thanksgiving holidays, had consistently exercised her right of visitation with M. T. F.

Because M. T. F. is not in the custody of the mother, whose rights are in issue, in determining whether M. T. F. is without proper care and control, we now consider, without being limited to, whether the mother, without justifiable cause, had failed significantly for a period of one year or longer *prior to* the filing of the termination petition to do the following:[13]

(a) *Develop and maintain a parental bond with the child.* There was no evidence that the mother failed to develop and maintain a parental bond with M. T. F. before the filing of the termination petition. Indeed, the evidence showed that the mother had always appeared ready for visitations, she appeared loving and caring toward M. T. F., and M. T. F. recognized her as his mother.

(b) *Provide for the care and support of the child.* Although there was some evidence that the mother had been unemployed periodically, there was no evidence presented that she failed to provide for the care and support of M. T. F.

---

[13] OCGA § 15-11-94 (b) (4) (C).

(c) *Comply with case plan.* Of the court's nine factual findings set out above, numbers 1 through 5, and 8, concerned events which transpired *before* the filing of the termination petition, the relevant period. (The remainder of the findings apply to events which transpired after the filing of the termination petition, and thus, we need not address them here.)

Regarding the relevant findings, there was some testimony that the mother missed some medical appointments because she did not have transportation. And the case plan did not require that the mother attend either therapy appointments or medical team meetings. Nor did the case plan prohibit the mother from living with her sister. But in any event, when DFCS later required that the mother move out of the sister's home, the mother complied. The mother's comment about M. T. F. being lazy was made early in the case, and the case manager addressed the issue; there was no evidence that the mother ever said it again. And although the evidence showed that the foster parents provided transportation for M. T. F. to visit with the mother, there was no evidence that the mother relied on them to do so; the evidence showed only that this was the established routine.

Concerning the court's finding that the mother had failed to show a steady stream of income, we have held that "the fact that a mother is unemployed, without

24

prospects for future employment, and without any stable living arrangements is not sufficient to terminate parental rights."[14] Here, although there was no evidence which the court considered to be verifiable proof of income, the mother had maintained stable housing and her prospects for future employment arguably were high because she was obtaining a college education.

"There is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. Accordingly, compelling facts are required to terminate parental rights."[15]

Given the facts of this case, the juvenile court erred in determining that there was clear and convincing evidence[16] that M. T. F. was deprived at the time of the January 2011 termination hearing.[17]

---

[14] *In the Interest of M. M.*, 263 Ga. App. 353, 359 (1) (587 SE2d 825) (2003) (punctuation and footnote omitted).

[15] Id. (footnote omitted).

[16] See OCGA § 15-11-94 (a).

[17] See generally *In the Interest of S. D.*, supra at 89-90 (2); *In the Interest of M. M.*, supra at 357-359; *In the Interest of T. J. J.*, supra; compare *In the Interest of C. R.*, 245 Ga. App. 697, 700 (2) (538 SE2d 776) (2000) (affirming termination of 16-year-old mother's parental rights where, among other things, present deprivation was

25

2. Because of our holding in Division 1,[18] we need not address the remaining considerations under OCGA § 15-11-94 (b) (4) (A).

*Judgment reversed. Ellington, C. J., and Dillard, J., concur.*

shown because mother was pregnant again, unemancipated, unmarried, had not demonstrated an ability to maintain consistent employment at even a subsistence level, was unable or unwilling to exercise her scheduled visitations, and failed to maintain a parental bond with the child in any meaningful, supportive way).

[18] Supra.

26