**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 4, 2014**

# In the Court of Appeals of Georgia

A13A2233, A13A2234. IN THE INTEREST OF B. W., a child; two
    cases.

MCFADDEN, Judge.

In 2006, the juvenile court found two-year-old B. W. to be deprived, placed him in the long-term custody of his maternal grandmother, and allowed his parents visitation with him. More than six years later, on December 18, 2012, the grandmother petitioned to terminate the parental rights of B. W.'s parents, alleging among other things that the boy "would be harmed by having a continuing relationship with his parents even on a visitation basis." The juvenile court granted the petition, from which the parents have filed separate appeals, the mother in Case No. A13A2233 and the father in Case No. A13A2234.

OCGA § 15-11-94 sets forth the procedure for termination of parental rights, which involves two steps. First, the juvenile court must find

> parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

*In the Interest of J. R. N.*, 291 Ga. App. 521, 525 (2) (662 SE2d 300) (2008) (citation omitted). On appeal, we view the evidence in the light most favorable to the juvenile court's ruling to determine whether a rational trier of fact could have found by clear and convincing evidence that the parents' rights should have been terminated. *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002). Because there was clear and convincing evidence supporting the juvenile court's termination of parental rights, we affirm in both cases.

1. *Facts and procedural background.*

On March 27, 2006, in response to a petition brought by the Department of Family and Children Services (DFCS), the juvenile court entered an order finding B. W. to be deprived, citing among other things the parents' drug use. In that order, the juvenile court placed B. W. in the long-term legal custody of his grandmother until his eighteenth birthday pursuant to OCGA § 15-11-58 and allowed the parents supervised visitation with him. See OCGA § 15-11-58 (i) (1) (A) (allowing juvenile court to place child in long-term custody of willing and qualified relative where reunification efforts with parents would be detrimental to child but termination of parental rights is not in child's best interest). The juvenile court also informed the parents in the order that she would not consider returning custody to them until they completed, at their own expense, all of the goals in a DFCS case plan then in existence, many of which addressed the parents' drug use. See also *Ertter v. Dunbar*, 292 Ga. 103, 105 (734 SE2d 403) (2012) (clarifying that custody awarded under OCGA § 15-11-58 is not "permanent" custody but "long-term" custody). The entry of this order apparently ended DFCS's involvement in the case.[1]

---

[1] For this reason, we hereby grant the motions filed in both appeals by the Georgia Department of Human Services, in which that agency seeks to be removed as a party to the appeals.

Court records indicate that the parents consented to the March 27, 2006 long-term custody order and, in any event, they did not appeal from that order. It also appears from the record that the arrangement established in that order functioned until 2011. From that point onward, the parties engaged in a heated and protracted dispute over B. W. Between April 2011 and December 2012, the parents unsuccessfully attempted to vacate the long-term custody order; the grandmother twice sought to suspend the parents' visitation with B. W. (the first instance resulting in a temporary suspension of visitation and the second instance resulting in a suspension of visitation that was in effect during the termination proceedings); and the juvenile court appointed a guardian ad litem who concluded that the dispute was having a detrimental effect on B. W. and that the parties might retaliate against B. W. in connection with their dispute.

On December 18, 2012, the grandmother filed her petition for termination of parental rights. She alleged that B. W. was currently deprived due to, among other things, the parents' continued drug use, their unstable financial and housing resources, a recent instance of domestic violence between them, their refusal to admit that B. W. previously had been sexually abused by another child in their household, their failure to provide consistent financial support for B. W., and their failure to

4

complete all of the goals set forth in the earlier DFCS case plan to which the juvenile court referred in the 2006 long-term custody order. She further alleged that visitation with the parents was and would continue to be harmful to B. W. and that a termination of parental rights was in his best interest.

At the March 4, 2013 termination hearing, the evidence showed that the parents were using illegal drugs in the months leading up to the hearing. The father admitted to using marijuana in January 2013. He failed a drug test because he did not produce a usable sample for the test, but he admitted that he was "dirty" at the time. The mother admitted to using methamphetamine and marijuana, and she tested positive for these substances in January 2013. On at least one occasion in the fall of 2012, the parents had attempted to flush illegal drugs from their systems before submitting to a drug test. And within the previous year, the parents had smoked a substance in a glass pipe in front of B. W. Neither parent had undergone treatment for their drug use, and the mother denied having a drug problem. Nevertheless, both testified that they intended to begin treatment immediately.

The hearing evidence showed that in the fall of 2012, the parents' failure to pay their utility bills and rent led to their power being turned off and their subsequent eviction from their residence. The father was employed but the mother was not, and

she testified that she had no employment prospects. At the time of the hearing, the parents were living with relatives in a portion of a warehouse that had been converted into a living area. Also living in their household was B. W.'s half sister, who was 13 years old at the time of the hearing. The half sister had a troubled history, including cutting her wrists on more than one occasion and engaging in promiscuous behavior with an 18-year-old man. B. W. previously had accused the half sister of sexually abusing him, but the parents denied that any such abuse had occurred.

The hearing evidence showed that in the fall of 2012, the father had "head butted" the mother during an argument, injuring her. The mother declined to seek assistance from law enforcement in response to this episode, but she briefly moved out of the household. Around this time, the father passed out and was taken to the hospital, where he was held for 24 hours for mental health reasons. The father testified that he was struggling with depression, which he attributed in part to his relationship with his wife, the mother. The mother again moved out of their household in December 2012, and she testified that she did so because she "couldn't deal with . . . everything," including "[t]he environment . . . that I'm living in."

The hearing evidence showed that both parents were significantly in arrears on child support payments for B. W. In the fall of 2012, the grandmother took out a

6

warrant on the mother for failure to pay child support, on which the mother ultimately was arrested and jailed. The parents tried to resolve the warrant by unsuccessfully proposing to the grandmother that they pay her an amount of child support significantly less than what they owed, which the grandmother would then return to them. The mother also offered to relinquish her parental rights in B. W. to the grandmother in exchange for being relieved of her child support duties.

The hearing evidence showed that B. W. has extensive special needs, including a form of autism, and needs structure from his caregivers. Although he was nine years old at the time of the hearing, he acted several years younger than that age and was in a kindergarten-through-second-grade class at a school that serves children with severe emotional and behavioral disabilities. He engaged in frequent, disruptive behavior at the school, that included threatening to kill others. He also displayed problematic behavior at home – "meltdowns," outbursts, screaming and bed-wetting – that coincided with his visits with his parents. Since the suspension of those visits, B. W. had seemed calmer and less stressed at home.

At the hearing, the juvenile court asked B. W.'s guardian ad litem for a recommendation. The guardian ad litem testified he believed it would be in B. W.'s best interest for the court to grant the petition to terminate parental rights. Although

he acknowledged the bond between B. W. and his parents, he opined that the boy was "very troubled," in part due to the dispute between the parents and the grandmother, that the parents could not provide the boy a stable home, and that the boy's problems would improve if the parents' rights were terminated.

2. *Parental misconduct or inability.*

The juvenile court found that B. W. was currently deprived, that the cause of the deprivation was the parent's lack of care and control, that this cause was likely to continue, and that continued deprivation was likely to cause B. W. serious physical, mental, emotional or moral harm. There was clear and convincing evidence to support these findings.

(a) *Current deprivation.*

First, there was clear and convincing evidence that B. W. was currently deprived, which in the case of noncustodial parents involves a showing that, "if the child was returned to his [parents] at the time of the hearing, he would be deprived. This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing." *In the Interest of M. T. F.*, 318 Ga. App. 135, 145-146 (1) (733 SE2d 432) (2012) (citation and punctuation omitted).

Although the parents argue that they have made improvements to their lives since the 2006 deprivation finding, some of the circumstances that led to the deprivation finding still existed or had resumed at the time of the termination hearing. The order finding B. W. to be deprived focused in large part on the parents' failure to take steps to address their drug use. The parents assert that they stopped using drugs for a period of time following that order. Nevertheless, by the time of the termination hearing they were again using illegal drugs, they were attempting to circumvent drug testing, and they had not undergone drug treatment even though their failure to do so was a basis for the 2006 deprivation finding. Because the parents did not appeal from the ruling that these circumstances showed B. W. was deprived, they cannot now claim that the same circumstances, again in existence at the time of the termination hearing, do not show deprivation. See *In the Interest of P. D. W.*, 296 Ga. App. 189, 192-193 (1) (a) (674 SE2d 338) (2009).

Moreover, there was clear and convincing evidence that, at the time of the termination hearing, the parents were not well-equipped to meet B. W.'s special needs. See *In the Interest of T. S.*, 310 Ga. App. 100, 102 (1) (712 SE2d 121) (2011) (court must focus on needs of child in determining whether child is deprived). B. W. has significant, challenging emotional and behavioral needs that require a highly

9

structured environment. The evidence set forth above, however, revealed the parents' lives to be volatile, chaotic, and sometimes violent. The father himself admitted that he was not ready to regain custody of B. W. This evidence showed that B. W. would remain deprived if returned to his parents' custody, and consequently the juvenile court was authorized to find him currently deprived.

(b) *Lack of proper parental care or control as cause of deprivation.*

The parents argue that the juvenile court erred in finding that B. W.'s deprivation was due to a lack of proper parental care or control, on the ground that they maintained a parental bond with the boy. The failure of a noncustodial parent "[t]o develop and maintain a parental bond with the child in a meaningful, supportive manner" is one of the factors for a juvenile court to consider in determining whether the child's deprivation is due to a lack of proper parental care or control. OCGA § 15-11-94 (b) (4) (C) (i). But this is not the only factor for the juvenile court to consider. See OCGA § 15-11-94 (b) (4) (B) & (C) (together listing nine factors relevant to whether a child's deprivation was due to the lack of proper parental care or control by a noncustodial parent).

The evidence set forth above showed that B. W.'s current deprivation was caused, among other things, by the parents' inability or unwillingness to remain drug-

10

free and their failure to obtain treatment for their drug use. As this behavior was also a basis for the unappealed deprivation order, the parents cannot now challenge that their continuing, untreated drug use was not a cause of B. W.'s deprivation. See *In the Interest of P. D. W.*, 296 Ga. App. at 192-193 (1) (a).

The evidence also contained evidence concerning the parents' unwillingness to pay child support. See *In the Interest of C. A. S.*, 308 Ga. App. 757, 760 (1) (708 SE2d 655) (2011) ("A parent's failure to pay child support is compelling evidence that she is not an able parent.") (citation omitted). Not only were both parents in arrears, but instead of paying the support they owed to resolve the warrant against the mother, they had tried to circumvent the warrant by offering to temporarily "give" the grandmother money and, in the case of the mother, by offering to give up her parental rights.

Moreover, the evidence showed that the parents either could not or would not establish and maintain the type of environment necessary to address B. W.'s significant special needs. Rather than the structured environment the boy required, the parents' living conditions were unstable and chaotic, and their relationship was volatile. There was evidence that the parents' continued involvement in B. W.'s life

11

had a negative effect on his emotional and behavioral state, regardless of the bond between them.

For these reasons, the juvenile court was authorized to find by clear and convincing evidence that a lack of proper parental care or control caused B. W.'s deprivation.

(c) *Likelihood of deprivation to continue*.

Although there was evidence that the parents had completed some of their case plan goals and that, for a time, they had stopped using illegal drugs, clear and convincing evidence supported the juvenile court's finding that B. W.'s deprivation was likely to continue. "[T]he juvenile court was authorized to consider the [parents'] past conduct in determining whether the causes of deprivation were likely to continue. And the decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." *In the Interest of D. B.*, 306 Ga. App. 129, 137 (1) (701 SE2d 588) (2010) (citation and punctuation omitted). The parents stated their intent to begin drug treatment, but "[j]udging the credibility of [the parents'] good intentions was a task for the juvenile court." *In the Interest of A. G.*, 253 Ga. App. 88, 90 (1) (c) (558 SE2d 62) (2001). In this case the juvenile court expressly found the mother to have perjured herself during the termination hearing.

And the evidence authorized the juvenile court to find that the other conditions contributing to B. W.'s deprivation, such as the ongoing antagonistic relationship between the parents and the grandmother and the parents' own instability, were not likely to change.

(d) *Likelihood that continued deprivation will cause serious harm.*

The parents have not argued that there was insufficient evidence that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to B. W., and there was clear and convincing evidence that B. W. was suffering – at least emotionally – from his parents' continued presence in his life. Under the circumstances of this case, the facts authorizing the finding that deprivation was likely to continue also authorize a finding that the continued deprivation was likely to cause serious harm. See *In the Interest of J. E.*, 309 Ga. App. 51, 57 (1) (d) (711 SE2d 5) (2011). Cf. *In the Interest of K. C. R.*, 283 Ga. App. 593, 595 (642 SE2d 214) (2007) (finding insufficient evidence that continued deprivation of child in long-term custody of grandparents was likely to cause child requisite harm, where the record showed that child was "living with family members and enjoy[ed] a stable home environment").

3. *Best interest.*

13

Likewise, the parents have not challenged the juvenile court's determination that the termination of their parental rights would be in B. W.'s best interest. And the evidence set forth above, including the guardian ad litem's recommendation, authorized that determination, which was a matter within the juvenile court's discretion. See *In the Interest of T. B. R.*, 304 Ga. App. 773, 782-783 (1) (e) (697 SE2d 878) (2010) (juvenile court did not abuse discretion in finding that termination of parental rights was in deprived child's best interest where parent was unable to provide for child's special needs). See generally *In the Interest of W. L. H.*, 292 Ga. 521, 524 (739 SE2d 322) (2013) ("The protector of a child's best interests is his guardian ad litem.") (footnote omitted).

*Judgments affirmed. Doyle, P. J., and Boggs, J., concur.*

14