**THIRD DIVISION
ELLINGTON, P. J.,
DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 13, 2015**

# In the Court of Appeals of Georgia

A15A0317. IN THE INTEREST OF R. E., M. C., L. P., AND J. P., children.

MCFADDEN, Judge.

The mother of the children whose interests are at issue appeals the termination of her parental rights. She argues that the evidence does not support the termination. We agree and reverse.

1. *Facts.*

On appeal from a juvenile court's order terminating parental rights, we view the evidence

> in the light most favorable to the juvenile court's ruling, and our review is limited to addressing the question of whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated. In this review, we must necessarily

defer to the juvenile court's fact finding, weighing of the evidence, and credibility determinations.

*In the Interest of C. M.*, 325 Ga. App. 869, 869-870 (1) (756 SE2d 5) (2014) (citation and punctuation omitted).

So viewed, the evidence shows that the four children involved in this case have the same mother and two different fathers. The two older children are R. E. and M. C.; their father is R. E. Sr. The two younger children are L. P. and J. P.; their father is R. S.; the mother lives with R. S. Not involved in this case are two more children of the mother with a third man, to whom the mother was married at the time of the termination hearing; those children live with their father.

In April 2010, the mother, who apparently had ongoing interactions with the Department of Family and Children Services (DFCS), began taking M. C. to weekly counseling appointments. An entity called Gateway – the nature of which is not explained in the record – had referred M. C. to a therapist for counseling because she was wetting and soiling herself. R. E. began seeing the same therapist in June for help with his Attention Deficit Hyperactivity Disorder. The mother continued to bring her children to the counseling appointments until funding for the program ended. The

2

therapist worked with the mother on her parenting skills, and the mother complied with the therapist's recommendations.

In July 2010, a DFCS employee accompanied the mother and these two children to a counseling appointment; the DFCS employee reported to the therapist that five-year-old M. C. and her six-year-old brother R. E. had been found naked together in a bedroom. With the therapist present, the DFCS employee questioned M. C. about sexual activity. The child denied any such activity with her brother. But she said that R. E. Sr. and "someone named James" – who remains unidentified – had touched her brother R. E.'s private parts. R. E. likewise denied engaging in sexual behavior with his sister, but said that his father, R. E. Sr., and "James" had touched him and that "James" had "put his mouth on his private parts." That was the only disclosure R. E. made. The record says nothing about the forensic interview techniques used or about efforts to avoid leading questions.

The police were called and a detective interviewed the children. This time, R. E. said that no one had touched him inappropriately. M. C. said that no one had touched her, but she again reported that her father, R. E. Sr., had touched R. E. inappropriately once. Her descriptions of that event varied however: at one point she said that she had seen the incident, at another that she had only "heard" it. The

detective tested her capacity to distinguish between telling the truth and telling a lie and concluded that five-year–old M.C. did not yet have that capacity. So she concluded that there was not enough evidence to bring charges.

A week later, on July 20, 2010, M. C. told the therapist that someone had "put his finger in her bottom." Again her descriptions of the event varied: "she went back and forth" about who had done it. In some of the child's accounts it was her brother R. E., in others it was R. S., the father of the younger children. The mother had noticed a possible physical sign of abuse, but again M. C. went "back and forth" with the mother about whether it was R. E. or R. S. who had touched her.

On December 2, 2011, in response to an outcry from M. C. at school, the detective interviewed the children again. M. C. told the detective that her brother R. E. had touched her private parts one time through her clothing. The detective did not testify about R. E.'s response to M. C.'s claim.

R. E. did tell the detective that he had seen R. S. and his mother having sex "a few times." The detective was unable to get the seven-year-old to elaborate.

The detective interviewed R. S., who lived with the mother and all of the children. But there is nothing in the record to indicate whether R. S. was ever confronted with the charge that he had improperly touched M. C. He did acknowledge

4

to the detective that he and the mother engaged in "poly-sex, meaning they had sex with other people." He described a single instance, two weeks before, when he and the mother had a friend over and while the children were asleep, the friend and R. S. engaged in a sexual act in the dining room/kitchen area of their trailer. The children never mentioned any exposure to this activity, and the mother explained that the children could not have seen it because she had locked them into a back bedroom.

R. S.was interviewed at the residence. The detective found it "disgusting" with "dirty clothes all over the place," "dirty dishes piled up everywhere," "food on the couch," and "holes in the trailer itself that you could fall through."

DFCS took the three oldest children into custody that day. Five months later, when J. P. was born, he too was taken into custody. The juvenile court approved a case plan that required the mother to attend parenting classes, to maintain a source of income, to maintain stable, clean, and safe housing, to complete counseling, and to complete a psychological evaluation.

In February 2012, the juvenile court found the three older children to be deprived. The court based its order on factual findings that the children "reported to school officials, police authorities, and representatives of the Department of Family and Children Services that they have been sexually molested by adults in their home

5

and each other. The children also report[ed] witnessing intercourse and other sexual acts between and among adults in the home including their parents and other third parties." The court further found that "[a]fter receiving the reports[,] when the police responded to the parents' home, they found the home to be in a deplorable condition." The court determined that "[t]he causes of deprivation are emotional abuse, sexual abuse of some or all of the children by others or by and among the children as well as neglect/lack of supervision by the parents and inadequate housing of the parents." Finally, the court concluded that the children "cannot adequately and safely be protected at home because of the acts of sexual depravity which they report in the home, its effects on them physically and emotionally, and the deplorable condition of the home." Once the youngest child was born, the juvenile court found him to be deprived as well, largely for the same reasons it had found his older siblings to be deprived.

In December 2013, DFCS filed a petition to terminate the rights of the mother and the two fathers, R. E. Sr. and R. S. DFCS alleged that the parents "perpetrated egregious past conduct towards these children of a physically, emotionally and sexually cruel and abusive nature." It alleged that the mother, for more than a year, had failed to provide care and support to the children; had failed to maintain safe and

6

stable housing; had failed to maintain stable income; had failed to maintain a bond with the children; and had failed "to complete counseling to address her poly-amorous lifestyle which has negatively impacted her children."

Following the termination hearing, the juvenile court terminated the parental rights of all parents. We granted the mother's application to appeal the termination order.

2. *Parental misconduct or inability*.

This case is controlled by the former Juvenile Code, which was effective through 2013. The new Juvenile Code adopted that year became effective on January 1, 2014; it applies to juvenile proceedings commenced on and after January 1, 2014. Ga. L. 2013, p. 294, §§ 1-1, 5-1.

Under the former Code, before terminating parental rights, a juvenile court first had to find clear and convincing evidence of parental misconduct or inability and then had to find that termination of parental rights was in the best interest of the children. Former OCGA § 15-11-94 (a). To determine parental misconduct or inability, the court had to find that:

> (i) The child is a deprived child, as such term is defined in [former] Code Section 15-11-2; (ii) The lack of proper parental care or control by

7

the parent in question is the cause of the child's status as deprived; (iii) Such cause of deprivation is likely to continue or will not likely be remedied; and (iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

Former OCGA § 15-11-94 (b) (4) (A). The mother argues that there was insufficient evidence of present parental misconduct or inability. We agree because clear and convincing evidence does not support a finding that the children were deprived at the time of the termination hearing or that any deprivation was likely to continue.

Former OCGA § 15-11-2 (8) (A) defined "deprived child" as a child "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." In order to terminate the mother's parental rights, DFCS had to prove by clear and convincing evidence that the children were deprived at the time of the termination hearing, "which in the case of noncustodial parents involves a showing that, if the child[ren were] returned to [their] parents at the time of the hearing, [they] would be deprived. This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing." *In the Interest of B. W.*, 325 Ga. App. 899, 902-903 (2) (a) (756

8

SE2d 25) (2014) (citation and punctuation omitted). DFCS also had to prove that the cause of any deprivation was likely to continue or was not likely to be remedied.

The juvenile court did not expressly find current deprivation. But in the "deprivation" section of her findings of fact, she found that the mother had insufficient and unstable housing and unstable employment and that "[t]he children [had] been harmed by the parents' lifestyle and the parents [had] not addressed, or attempted to remediate that lifestyle, nor [had] they changed that lifestyle, or learned how to protect these damaged children." The court found that deprivation was likely to continue because the home remained unstable; the mother had not addressed her "psychological and lifestyle issues"; she continued "to stand by [R. S.] at the expense of her children"; and she had "fallen woefully short of completion of [her] reunification plan."

"In our view, even construing the evidence in the light most favorable to the termination order, as we must on appeal, several pertinent findings in the juvenile court's order were either contrary to or not clearly and convincingly shown by the evidence." *In the Interest of C. J. V.*, 323 Ga. App. 283, 286 (746 SE2d 783) (2013). Most importantly, the juvenile court's finding that "[t]he children [had] been harmed by the parents' lifestyle" is completely unsupported by the evidence. Although the

9

order is not clear, we assume that the juvenile court was referring to what her order describes as the parents' "polyamorous lifestyle." As for the parents' sexual practices, however, the evidence showed only one unusual incident, and there was no testimony that the children were exposed to it. This is not the clear and convincing proof required to sever the parent-child relationship. See *In the Interest of G. R. B.*, 330 Ga. App. 693, 701 (769 SE2d 119) (2015) (because there was no evidence child was harmed by parents' physical altercations and domestic violence, evidence did not support finding of deprivation). Further, although the older children R. E. and M. C. may have been sexually abused, there was no testimony at the termination hearing that the mother was either responsible for or complicit in the abuse. Nor was there clear and convincing evidence that R. S. (the father of the younger children) was the abuser. We observe that even before the case plan was ordered, the mother had begun taking the children to therapy and had cooperated with the therapist's recommendations. And the mother's relationship with R. S. is an insufficient basis for terminating her parental rights because there was no showing, by clear and convicting evidence, that R. S.'s presence would negatively affect the children. *In the Interest of J. V. J.*, 329 Ga. App. 421, 427-428 (765 SE2d 389) (2014) (mother's cohabitation

with boyfriend was insufficient to terminate parental rights, given that there was no evidence that boyfriend's drug use or cohabitation would negatively affect child).

Nor does clear and convincing evidence support the juvenile court's findings that the mother had unstable housing and unstable employment. She testified that she had purchased a mobile home and simply needed to register the title. She had completed all major structural repairs on the home, although her financial limitations delayed her. The mother had had a full time job, but quit and took two part-time jobs so that she would be able to fulfill her visitation and counseling obligations.[1] Although the mother's financial resources were seemingly limited, poverty does not justify the termination of parental rights. *In the Interest of C. J. V.*, 323 Ga. App. at 286-287 (explaining that evidence that a mother is "unemployed, without prospects for future employment, and without any stable living arrangements" is an insufficient basis to terminate her parental rights) (punctuation omitted).

Moreover, contrary to the juvenile court's finding, the evidence clearly showed that the mother had met or substantially had completed many of the major goals of her

---

[1]We are troubled by the mother's undisputed testimony that she gave up a full-time job where she was under consideration for a promotion because she could not work the hours expected of a prospective manager and also satisfy the extensive time demands of her case plan. We expect DFCS to accommodate parents' need to make a living.

case plan. In addition to the housing and employment requirements, the mother had completed parenting classes and parent aide services. She had undergone a psychological evaluation. She was undergoing individual counseling, and her therapist testified that she was doing well and was compliant with his therapeutic regime. The mother visited the children regularly, and there was no testimony that her interactions with them were negative or harmful.

"[I]t is well settled that termination of parental rights is a remedy of last resort which can be sustained only when there is *clear and convincing evidence* that the cause of the deprivation is likely to continue." *In the Interest of J. V. J.*, 329 Ga. App. at 424 (citations and punctuation omitted; emphasis in original). Even construing the evidence in the light most favorable to the termination order, it does not clearly and convincingly show that the cause of any deprivation is likely to continue. We therefore reverse the juvenile court's judgment. Accordingly, "we need not reach the issue of harm or the second stage of the inquiry concerning the best interests of the children." *In the Interest of C. J. V.*, 323 Ga. App. at 288. Nor do we reach the mother's arguments that DFCS failed to conduct a thorough and exhaustive search for a suitable family member with whom to place the children.

*Judgment reversed.  Dillard, J., concurs*; *Ellington, P. J., concurs in the judgment only.*