A03A1454. IN THE INTEREST OF E. M., a child.
(590 SE2d 241)

PHIPPS, Judge.

The father of a seven-year-old boy appeals an order of the Juvenile Court of Athens-Clarke County finding the child deprived and transferring custody of him to the Athens-Clarke County Department of Family and Children Services (DFCS). Because the evidence is insufficient to support a finding that the father has lost his right to custody of the child, we reverse.

Under OCGA § 15-11-2 (8) (A), "[a] 'deprived child' is one who is 'without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals.' [Cit.]"[1] "The definition of a deprived child, as contained in OCGA § 15-11-2 (8), 'focuses upon the needs of the child regardless of parental fault. . . . The petition is brought on behalf of the child and it is (the child's) welfare and not who is responsible for the conditions which amount to deprivation that is the issue.' [Cit.]"[2] But a finding that a child is deprived does not necessarily result in a loss of custody by the parent.[3]

> To authorize "even a loss of temporary custody by a child's parents, on the basis of deprivation, the deprivation must be shown to have resulted from unfitness on the part of the

[1] *In the Interest of C. N.*, 231 Ga. App. 639, 640 (1) (500 SE2d 400) (1998).
[2] (Footnote and emphasis omitted.) *In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997).
[3] See id.

parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." [Cit.][4]

"On appeal from a finding that a child is deprived, 'we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the (child was) deprived. . . .' [Cit.]"[5] Proof of parental unfitness must also be clear and convincing.[6]

> This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.[7]

At the time of the deprivation hearing in this case, the father was forty-one years old, and E. M. was almost six years old. They had arrived in Athens only a couple of weeks before the hearing. Prior to coming to Athens, they had lived in Augusta for about a month. Before that, they had lived in Atlanta for about four years.

For reasons undisclosed by the record, the Fulton County DFCS intervened in their lives when they were residing in Atlanta. After DFCS workers came to their residence, the father was arrested due to aggressive behavior, and E. M. was temporarily placed in foster care until the criminal charges against the father were dismissed. The father then moved to Augusta, where he enrolled E. M. in elementary school. Because E. M.'s behavior was extremely disruptive, he remained in school for only about five days. After E. M. was temporarily suspended from school, the father decided to move to Athens because he had heard that he could obtain housing vouchers there.

Upon his arrival in Athens, the father obtained financial assistance from a church and began living with E. M. in a motel. The church referred the father to Action, Inc., a homeless day service center. The father was interviewed by an Action employee in the presence of E. M. The Action employee testified that E. M. was

---

[4] *In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998).

[5] *In the Interest of K. C. H.*, 257 Ga. App. 529, 530 (571 SE2d 515) (2002).

[6] *In re M. M. A.*, 166 Ga. App. 620, 622 (1) (305 SE2d 139) (1983) (physical precedent only).

[7] (Footnote omitted.) *In the Interest of M. L. C.*, 249 Ga. App. 435, 436 (2) (548 SE2d 137) (2001).

extremely rambunctious; that the father tried to talk to the child as though he were an adult; that the father could not calm the child down; and that, as a result, the father seemed to become extremely agitated and angry. The Action employee described the father's behavior toward the child as "borderline aggressive behavior, verbal not physical."

DFCS received a report about aggressive and inappropriate behavior exhibited by the father toward E. M. after they had arrived in Athens. The day after the report was made, a DFCS investigator met with the father at the motel where he was staying. The investigator testified that she was unable to interview E. M. because of his extreme hyperactivity. DFCS paid for the father to stay in the motel with E. M. for an additional night. When the investigator met with the father the following day, he informed her that he had decided to take E. M. to Florida in order to obtain the assistance of E. M.'s mother in taking care of him. Because the investigator thought it unwise for the father to leave town with E. M., she lured him to the DFCS office by promising that she would provide him with bus tickets to Florida. When he got there, DFCS forcefully removed the child from his custody.

Upon being taken away from his father, E. M. was placed in foster care in the home of an elementary school teacher. She testified that upon being placed in kindergarten, he was very disruptive in class, could not stay on task, and was behind the other students academically. When she took him out in public, he displayed inappropriate behavior toward other children and adults. When she took him home, he began doing such things as turning flips on the living room rug near a glass table. In her words, he was "a handful." But he was in good physical health, and he could dress himself and knew how to bathe himself. When he got ready for bed, he would cry for his father. Testimony given by the elementary school teacher showed that E. M. acted so disruptively in foster care that he was placed in numerous different foster homes. The father testified that when he visited his son, E. M. complained to him that he had been sexually molested. The DFCS case manager appeared at the deprivation hearing and testified that he would investigate the molestation charges.

At the deprivation hearing, the father also testified that he had affiliated himself with a church; that one of the church members was letting him live in her house; that there was a room there for E. M.; and that the church had hired him to do custodial work for an indeterminate number of hours per week. He also showed that he had been receiving monthly payments from the Social Security system.

In describing a conversation with his son concerning the problems he was having in the school in Augusta, the father testified that he sat down and told E. M., "man, this ain't working, man. I said,

you've got to listen to these teachers, you know. You ain't listening, man. You've got to listen, like that." According to the father, E. M. said in response, "daddy, it's going to be okay, man."

The father's stated goal was to find employment and a stable living environment to accommodate his son's needs and to do "whatever it takes" to provide for his son. The father testified that no one had previously recommended that he have a psychological evaluation conducted on the child or that he medicate him; and that he was concerned about giving the child prescription drugs because he is allergic to certain types of medication; but that he was not unalterably opposed to medicating him, although he would prefer to try spiritual counseling first. In fact, he testified that he had tried reading the Bible to E. M. and praying with him, and that this had alleviated E. M.'s behavioral problems. He acknowledged that E. M. needed counseling and agreed to provide it for him. He also agreed to attend parenting classes.

A psychologist who had evaluated E. M. shortly before the deprivation hearing found E. M. to be extremely hyperactive, highly distractable, and impulsive, and diagnosed him with attention deficit hyperactivity disorder in the ninety-ninth percentile. He also testified that E. M. was in a delayed category for school readiness, having scored in the second percentile on a school readiness composite. E. M. had scored 80 on an IQ test, which was in the ninth percentile. The psychologist recommended that E. M. be evaluated by a child psychiatrist or behavioral pediatrician to determine if pharmacological intervention was warranted. He also testified that E. M. needs a home setting that provides adequate structure and consistency. He acknowledged that parenting classes were available to the father through several programs. The psychologist testified that E. M. was not experiencing any emotional disturbances such as anxiety or depression, but rather had behavioral problems. The DFCS case manager testified that there was a "pretty strong bond" between E. M. and his father.

The juvenile court found that the father had arrived in Athens without funds or ability to provide shelter or financial support for himself or E. M. and that he had not secured housing or the means to provide housing for himself and the child. The court further found that the father had not addressed E. M.'s emotional problems and that there was no indication he had the training or ability to do so. The court, however, acknowledged the possibility that the father could learn how to do so. The court concluded that the child was deprived and that the causes of his deprivation were the father's lack of stable housing and income, and his failure to address the child's emotional problems. Temporary custody was therefore transferred to

DFCS. In the order appealed, the court did not comment on the child's allegations of sexual molestation while in DFCS custody.

The juvenile court's finding that the father lacked the ability to provide shelter for his son is contrary to the evidence. The evidence shows without contradiction that, albeit with the assistance of others, the father had always managed to put a roof over his son's head and that, at the time of the deprivation hearing, he had found a house in which he and E. M. could live, at least temporarily. The father's testimony showed, again without contradiction, that at one time he was a minister; that, during the past several years, he had been employed in other occupations; and that he possessed various job skills. There was no evidence of abuse or abandonment.[8] The evidence was uncontroverted that the father, in taking care of E. M. to the best of his ability,[9] had adequately provided him with food, clothing, and basic medical care, as well as shelter. It was undisputed that E. M. was in good physical health. The evaluating psychologist did not find any deficiency in E. M.'s emotional health. Rather, the psychologist testified that E. M.'s problems were behavioral in nature and that his intellectual functioning was in the lower percentiles.

Reviewed in a light most favorable to the juvenile court's judgment, the evidence was insufficient to clearly and convincingly establish that E. M. was a deprived child within the meaning of Georgia law. And even if the evidence was sufficient to show that the child was in some way deprived, it was wholly insufficient to establish that the father was unfit. The record shows that the father is willing to provide his son with the care that the law requires. And, as acknowledged by the juvenile court, there was no evidence that the father is physically or mentally incapable of providing such care. Although the father's inability to secure stable housing and employment regrettably serves neither his nor his child's best interests, it in no way constitutes intentional or unintentional misconduct resulting in abuse or neglect of the child. Consequently, the juvenile court erred in finding the child deprived and transferring custody of the child from the father to DFCS.

*Judgment reversed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 21, 2003.

*Joel N. Shiver*, for appellant.
*Thurbert E. Baker, Attorney General, William C. Joy, Senior*

---

[8] See *In re Suggs*, 249 Ga. 365, 366 (2) (291 SE2d 233) (1982); compare *In the Interest of U. B.*, 246 Ga. App. 328 (1) (540 SE2d 278) (2000).

[9] *In the Interest of D. E. K.*, 236 Ga. App. 574, 577 (512 SE2d 690) (1999).

*Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Ellison & Forester, Randall H. Forester,* for appellee.