665 S.E.2d 39 (2008)
In the Interest of C.R., a child.
Nos. A08A0486, A08A0487.
Court of Appeals of Georgia.
June 27, 2008.
*41 James N. Finkelstein, Albany, for appellant (case no. A08A0486).
Moore & Palmer, Lisa M. Palmer, for appellant (case no. A08A0487).
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Eidson & Mathis, Patrick S. Eidson, for appellee.
SMITH, Presiding Judge.
The mother and father of two-year-old C.R. appeal from the juvenile court's order finding C.R. to be deprived and awarding temporary custody to the Department of Family and Children Services (DFACS). In Case No. A08A0487, the mother challenges the sufficiency of the evidence and contends that the juvenile court erred in refusing to rule on her motion to withdraw a stipulation regarding deprivation. In Case No. A08A0486, the father contends that the juvenile court erred in finding deprivation and awarding temporary custody of C.R. to DFACS, and in failing to dismiss both the order for shelter care and the deprivation petition. Because these cases involve the same set of facts, we have consolidated them for appeal. For the reasons set forth below, we affirm the finding of deprivation but agree with the father that the court erred in awarding temporary custody to DFACS.

*42 On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. In doing so, we neither weigh the evidence nor determine the credibility of witnesses; instead, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.
(Citations, punctuation and footnotes omitted.) In the Interest of H.S., 285 Ga.App. 839, 648 S.E.2d 143 (2007).
So viewed, the evidence showed that C.R. was placed in DFACS custody following an order for shelter care filed on January 17, 2007.[1] The order stated that C.R. was being placed in shelter care because the mother did not want the child, was in the process of giving the child to his paternal grandfather, and had tested positive for cocaine in the past. The order stated further that the father, who lived with the paternal grandfather, had been ordered by a magistrate court to have no contact with the child following a charge of stalking and threatening the mother and her parents.
Following the hearing on the order for shelter care held on January 22, 2007,[2] the court found probable cause to believe that C.R. was deprived because the mother had a drug dependency problem, and the father was a threat to the child and had a bond condition requiring no contact with the child, the mother, or members of the mother's family. Four days after the hearing, DFACS filed a petition for temporary custody of C.R. alleging that the child was deprived due to drug abuse by the mother and father, failure of the mother to maintain stable employment, the mother's incarceration for theft by taking, and the father having a condition of bond that forbade him from contacting the child, the mother, or her family.[3]
At the February 2007 hearing on the petition alleging deprivation, the evidence showed that C.R. was born on September 3, 2005, and that he resided with his mother and father in the maternal grandparents' home from the time he was two weeks old until December 2005. In December or early January, the mother, father, and C.R. moved out of the maternal grandparents' home and moved in with the father's sister.[4] The mother and father separated in March 2006, and the mother and C.R. returned to the maternal grandparents' home. At some point, the mother and C.R. moved in with the mother's cousin, but then both returned to the home of the maternal grandparents until January 17, 2007, when the mother took C.R. to his father and told him she could no longer take care of the child and that DFACS "was after them."
A caseworker testified that DFACS first became involved with the family when it received a report in September 2006 that the mother and her boyfriend[5] were using ecstasy and cocaine and that the mother did not for provide C.R.'s care. The mother considered giving her parents guardianship of C.R. and informed the caseworker that she and the father had an older child that the maternal grandparents had previously adopted. The caseworker testified further that under a safety plan, she was to see the mother twice a month and that the mother was to submit to a drug screen twice per month. The mother was also required to seek employment and obtain housing. Following a positive drug screen in December 2006, the mother ceased submitting to the screens, and the caseworker could not locate her. When the caseworker located the mother in late December 2006, the mother explained that she had been "going back and forth" between her parents' home and her cousin's home. *43 The caseworker was again unable to locate the mother between December 21, 2006, and January 17, 2007. The caseworker had no interaction with the father and stated that the father had no involvement in the case during this time. The caseworker testified that the mother expressed fear of C.R.'s father, stating: "I am afraid he is going to hurt me. One day he may kill me."
The mother testified that she and the father had used cocaine before and after C.R.'s birth. She admitted that when she lived with her cousin, the cousin would care for C.R. when she went to use drugs. She also admitted that in December 2005, while the maternal grandparents were on vacation, she and the father took money and an ATM card from the grandparents' home in order to buy drugs. When asked whether the father supported C.R., the mother testified that the father only bought diapers for C.R. when the child resided with him, had paid for C.R.'s daycare on one occasion, and had once given her $140 in child support. When asked about the father's violent propensity, the mother stated that the father had choked her on one occasion when she was pregnant with C.R.
The father testified that the last time he used drugs was in March 2006 when he failed his employer's drug test. He denied choking the mother and stated that he had never physically abused the mother. Although the father's salary at the time of the hearing was approximately $2,000 per month, he could not state exactly how much he had paid to support C.R., but asserted that it was at least $50 per week. He then testified that in the year before the hearing, he paid $1,000 in child support  much less than $50 per week. He stated further that he had bought diapers, formula, baby food, medicine, and clothing for C.R. over time.
The maternal grandmother testified that C.R. lived with her and her husband for all but six months of his life. She stated that when she and her husband went on a vacation in December 2005, they returned to find that the mother and father had stolen money and credit cards. When the maternal grandparents confronted the mother and father about the stolen money and asked that they be repaid, the father began threatening to "come over and shoot [them]." The threats continued until August or September 2006, when the maternal grandparents went to the police. These incidents were the basis of the stalking charge against the father. The maternal grandmother stated further that the mother admitted to her that the stolen money was used for drugs, and the father admitted at the deprivation hearing that he and the mother had taken the money.
The maternal grandfather testified that when he confronted the father about repaying money stolen from his home, the father began to threaten him, stating "I will kill you. I will take care of all of y'all." The father denied making the threats, but admitted that he and the maternal grandfather had a heated argument where they each threatened to "kick" each other's "ass." The maternal grandfather stated that the father again threatened to kill him in August or September 2006. In December 2006, during an argument about the stolen money, the father "charged [him] like he was going to, you know, do something."
Following the hearing, the juvenile court found that C.R. was deprived and ordered that the child be placed in the temporary custody of DFACS. The court found that the cause of C.R.'s deprivation was substance abuse by the mother and domestic violence by the father. The court also ordered that DFACS prepare a case plan for reunification.
1. The mother and the father both contend that there was insufficient evidence to support the juvenile court's finding of deprivation.[6] Under OCGA § 15-11-2(8)(A), a deprived child is a child "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."
(a) Viewed in the light most favorable to the juvenile court's ruling, the evidence here showed that the mother used cocaine *44 both before and after the birth of C.R., that she had unstable housing, and often left C.R. in the care of others when she went to use drugs. The mother gave conflicting testimony concerning her last use of drugs. She first admitted using drugs up until March 2006 when C.R. was six months old, but then later admitted that she last used cocaine on January 21, 2007, the day of the 72-hour hearing. Moreover, in December 2006, the mother failed a drug screen.
In determining whether a child is without proper parental care or control, the juvenile court may consider[ ] excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child.
(Citations, punctuation and footnote omitted.) In the Interest of J. L., 269 Ga.App. 226, 229(1), 603 S.E.2d 742 (2004). Clear and convincing evidence was presented here that the mother had a history of drug abuse which continued after C.R. was born and during the mother's care of C.R. The juvenile court therefore did not err in finding that C.R. was deprived due to the mother's drug use and in finding that the deprivation was a result of the mother's unfitness to care for C.R. See id.
(b) The father argues that the juvenile court erred in finding that his history of "domestic aggressiveness" was also a cause of the deprivation. But the petition alleging deprivation "is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue." (Citations, punctuation and footnote omitted.) In the Interest of J.L., supra, 269 Ga.App. 228(1), 603 S.E.2d 742; In the Interest of E.M., 264 Ga.App. 277, 590 S.E.2d 241 (2003). We have held that there was clear and convincing evidence that C.R. was deprived due to the mother's substance abuse, and the evidence showed that C.R. was in her care for the majority of his life, save the few months when the father resided with C.R. and the mother. Therefore, the father's argument concerning deprivation here is irrelevant.[7]
2. Both the mother and father argue that the juvenile court erred in awarding temporary custody to DFACS. "[A] temporary loss of custody is not authorized unless the deprivation resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." (Citations and punctuation omitted.) In the Interest of M.K., 288 Ga.App. 71(1), 653 S.E.2d 354 (2007). "[A] finding that a child is deprived does not necessarily result in a loss of custody by the parent." (Citation and footnote omitted.) In the Interest of E.M., supra, 264 Ga.App. at 277, 590 S.E.2d 241. There must be clear and convincing evidence of parental unfitness. Id. at 278, 590 S.E.2d 241.
[P]roof of unfitness must be shown by clear and convincing evidence as this standard recognizes the importance of the familial bond and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. It follows that only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.
(Citations, punctuation and footnotes omitted.) In the Interest of H.S., supra, 285 Ga.App. at 841, 648 S.E.2d 143.
Although we have held in Division 1 that there was clear and convincing evidence of parental unfitness on the part of the mother, we cannot agree that this showing was made with respect to the father. The trial court made no specific findings with regard to the father's parental unfitness, but found the following *45 as the cause of C.R.'s deprivation attributable to the father: "[O]n January 19, 2007, in blatant disregard for his bond conditions, [the father] had sexual relations with [the mother]," "threatened to put [the mother] out of his car on the side of the road," and "had arguments [with the mother] in front of the children."[8] The court found further that the father had arguments with the maternal grandparents and that he and the maternal grandfather "had mutually threatened each other."[9] The court concluded that the father's
"history of domestic aggressiveness" as evidenced by his own testimony coupled with his blatant disregard for authority and the legal system that is apparent due to his lack of respect for his bond conditions and game-playing with custody matters put [C.R.] in a particularly vulnerable position as he is only approximately nineteen months old and has a mother with a substance abuse problem.
We recognize that other evidence was presented that could have supported a finding of parental unfitness,[10] but the trial court made no findings with respect to this evidence. Instead, the juvenile court, as the finder of fact, made only the specific findings listed above.
Under the circumstances here, no evidence was presented and the juvenile court made no findings to show how any of the incidents cited by the juvenile court harmed C.R., or that they had a negative effect on the child, or even that they were all committed in C.R.'s presence. See In the Interest of H.S., supra, 285 Ga.App. at 842, 648 S.E.2d 143. The isolated arguments and threats cited by the juvenile court do not provide clear and convincing evidence of a violent history demonstrating parental unfitness. In fact, there was evidence presented that the father cared for C.R. and provided for his needs during the time C.R. resided with him. The evidence here relied upon by the juvenile court and presented in its findings of fact did not establish that the father was unfit, i.e., that he had a mental or physical inability to care for C.R. warranting a grant of temporary custody to DFACS. See In the Interest of E.M., supra, 264 Ga.App. at 281, 590 S.E.2d 241. There must be clear and convincing evidence that the parents are unfit to support a grant of temporary custody to DFACS. Here, clear and convincing evidence supported only a finding that the mother was unfit  not the father. We therefore reverse the juvenile court's award of temporary custody to DFACS and remand this case for re-evaluation based on the parties' current circumstances.
3. The mother argues that the court erred in refusing to allow her to withdraw her stipulation regarding deprivation. Because the trial court ruled upon the merits of the deprivation petition based upon the evidence presented, this argument is moot.
4. The father contends that the court erred in denying his motion to dismiss the order for shelter care and the deprivation petition for improper venue. He argues that Lee County was not the proper venue because C.R. resided with him in Colquitt County when the shelter care order was filed on January 17, 2007, and that for over a month prior to that date, the mother and C.R. lived with the mother's cousin in Dougherty County.
OCGA § 15-11-29(a) provides that a juvenile proceeding "may be commenced in the county in which the child resides," or "[i]f deprivation is alleged, the proceeding may be brought in the county in which the child is present when it is commenced." Because the record reveals that C.R. had resided with his mother and maternal grandparents in Lee County for ten out of his sixteen months of *46 life when the order for shelter care and petition alleging deprivation were filed, the trial court did not err in ruling that Lee County was a proper venue for the action. Cf. In the Interest of K.C.H., 257 Ga.App. 529, 531(1), 571 S.E.2d 515 (2002) (evidence supported court's finding that venue was proper in county where child was born and parents resided although mother claimed she had moved the day before child was born).
5. The father argues that the trial court erred in denying his motion to dismiss both the order for shelter care and the deprivation petition because they were "legally insufficient." He contends that he was deprived of due process because the allegations provided no notice of specific conduct. Both petitions alleged that the mother was abusing drugs and was attempting to put C.R. in the care of the paternal grandfather. The petitions alleged further that the father, who resided with the paternal grandfather, was on bond for a stalking charge and as a condition of that bond could not have any contact with the mother or any member of her family. "The fundamental idea of due process is notice and an opportunity to be heard." (Citations and punctuation omitted.) In the Interest of A.J., 269 Ga.App. 580, 581(1), 604 S.E.2d 635 (2004). Here, the petitions were sufficient to put the father on notice of the factual basis supporting shelter care and the allegation of deprivation. See In the Interest of R.B., 285 Ga.App. 556, 562(4), 647 S.E.2d 300 (2007); In the Interest of D.C., 268 Ga.App. 882, 884-885(1), 602 S.E.2d 885 (2004) (physical precedent only) (notice to mother was sufficient under principles of notice pleading).
6. The father contends that the trial court erred in denying his motion to dismiss the deprivation petition because the court failed to hold a hearing within ten days of the date of filing of the petition. OCGA § 15-11-39(a) provides that "[a]fter the petition has been filed the court shall set a hearing thereon, which, if the child is in detention, shall not be later than ten days after the filing of the petition." The Georgia Supreme Court has interpreted "detention" to include custody by DFACS. See Sanchez v. Walker County Dept. of Family etc. Svcs., 237 Ga. 406, 409, 229 S.E.2d 66 (1976). And our appellate courts have held that OCGA § 15-11-39(a) requires the juvenile court to set the hearing within ten days after the petition is filed. Id.; see In the Interest of E.S., 262 Ga.App. 768, 769(1)(a), 586 S.E.2d 691 (2003). Here, the petition was filed on January 26, 2007, and the court held a hearing on February 5, 2007, but the case was continued until February 13 because the mother's counsel had a scheduling conflict and was unable to be present on the earlier date. Therefore the hearing was set and held within ten days of the filing of the petition although it was then continued, an action that was within the trial court's discretion. See id.
Judgment affirmed in Case No. A08A0487. Judgment affirmed in part and reversed in part, and case remanded in Case No. A08A0486.
MIKELL and ADAMS, JJ., concur.
NOTES
[1] C.R. was placed in the physical custody of his maternal grandparents.
[2] The record reveals that the father legitimated C.R. just prior to the hearing.
[3] In a February 13, 2007 order, a superior court ordered that the father's conditions of bond remain in force except that he would be allowed to have contact with C.R. under the supervision of DFACS.
[4] There was evidence that the three lived with the paternal grandfather for some time as well.
[5] The boyfriend mentioned in the report is not the father.
[6] The mother had stipulated that C.R. was deprived due to her substance abuse, but prior to the court's ruling filed a motion to withdraw that stipulation.
[7] Although the parents attempted to point out at the hearing that C.R. has been well cared for and has never gone without food or clothing, the relevant inquiry is whether the parents were incapable of caring for the child, not whether the maternal grandparents or others have been "doing a good job" in taking over duties that the parents abandoned. In the Interest of A.B., 289 Ga.App. 655, 656(1), 658 S.E.2d 205 (2008).
[8] We note that the bond was extinguished on August 13, 2007, when the stalking charges against the father were nol prossed.
[9] Although the juvenile court made no specific findings regarding parental unfitness, we will assume that its findings regarding deprivation were also the bases for finding parental unfitness.
[10] Evidence was presented that the father did not support the child when the child was not living with him, that he used drugs after the birth of C.R., that he threatened to take C.R. away, and that he threatened the maternal grandparents' household, stating "I will kill you. I will take care of all of y'all."