**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**November 16, 2015**

# In the Court of Appeals of Georgia

A15A1144. IN THE INTEREST OF J. C., a child.

MCFADDEN, Judge.

The mother of J. C. appeals from the juvenile court's March 5, 2014 order transferring temporary legal custody of the child, then one-and-a-half years old, from the mother to the child's aunt. Because there was not clear and convincing evidence that at the time of the transfer order the child was presently deprived due to the mother's parental unfitness, we reverse.

Georgia's former juvenile code applies to this case because it was commenced in 2013. See generally *In the Interest of G. R. B.*, 330 Ga. App. 693 n. 1 (769 SE2d 119) (2015) (explaining that new juvenile code applies to juvenile proceedings commenced on and after January 1, 2014, and describing changes made by new juvenile code pertaining to deprivation proceedings). The former juvenile code

authorized a juvenile court to transfer temporary legal custody of a child from a parent to one of several enumerated persons or entities if the child was found to be a deprived child. Former OCGA § 15-11-55 (a) (2) (A).

A "deprived child" is a child who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals[.]" Former OCGA § 15-11-2 (8) (A). "[A]n order temporarily transferring custody of a child based on alleged deprivation must be grounded upon a finding that the child is *at the present time* a deprived child, and a finding of parental unfitness is essential to support an adjudication of *present* deprivation." *In the Interest of G. S.*, 279 Ga. App. 89, 92 (630 SE2d 607) (2006) (citations and punctuation omitted; emphasis in original); accord *In re J. C. P.*, 167 Ga. App. 572, 575-576 (307 SE2d 1) (1983) (on motion for reconsideration). In other words,

> [t]o authorize even a loss of temporary custody by a child's parents, on the basis of deprivation, the deprivation must be shown to have resulted from unfitness on the part of the parent, that is either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapacity to care for the child.

2

*In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998) (citation and punctuation omitted).

1. *Facts and procedural history.*

Keeping the above standards in mind, we turn to the evidence, which we view "in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived." *In the Interest of G. S.*, 279 Ga. App. at 91 (citation and punctuation omitted).

Viewed most favorably to the juvenile court's judgment, the evidence shows that J. C. was born in Baltimore on September 1, 2012, when the mother was 23 years old. Before J. C.'s birth, the mother had lived with her own mother, then moved to Baltimore where she lived at various times with her stepfather (who abused her), with a former boyfriend, with female friends, and on the streets working as a prostitute. At the time of J. C.'s birth, the mother lived in a homeless shelter. She did not know with certainty the identity of J. C.'s father but believed he could have been her stepfather.

In November 2012, the mother and J. C. moved into the house of the mother's sister ("the aunt") in Georgia. While living with the aunt, the mother engaged in some cutting behavior. Sometimes she would take J. C. across the street to spend time with

neighbors whom the aunt described as "wrong people" because they fought and drank. Occasionally the aunt would see the mother drink alcohol, but she testified that the mother did not drink much. However, the mother smoked marijuana and at some point, at the mother's request, the aunt provided the mother with a urine specimen for a drug test. The mother did not get along with the aunt and planned to move back in with her own mother, but in January 2013 her mother passed away.

In February 2013, the mother and the aunt got into a verbal argument, leading the mother to pack her and J. C.'s belongings and leave the house to stay with friends. The mother had no transportation, the weather was very cold, and the aunt did not know where the mother was going. The Department of Family and Children's Services ("DFCS") became involved; the appellate record contains sparse details on this point but does contain an unappealed deprivation order in which the juvenile court pertinently found

> that [DFCS] received allegations that the child was being neglected due to the mother's mental instability. The mother [had] recently attempted to leave [the aunt's] home in the rain while holding the child after an argument with [the aunt]. DFCS and law enforcement arrived at the residence and the mother was belligerent and verbally combative. . . . The mother admits to cutting herself. She reports that she yells at the baby but has never physically harmed him.

4

On March 3, 2013, the mother and DFCS agreed to an "impending danger safety plan" that did not articulate any specific safety threats but stated that J. C. would live with the aunt and the mother would have supervised visits with him at the aunt's home.

At a May 14, 2013, adjudicatory hearing the mother, acting pro se, stipulated that J. C. was deprived.[1] (The appellate record does not contain a transcript of that

---

[1] The unappealed deprivation order states that the mother waived counsel. From counsels' statements at oral argument, it appears that such waivers, negotiated with DFCS, may be a regular occurrence at adjudicatory hearings in deprivation cases in some jurisdictions.

Although the propriety of this waiver of counsel is not raised on appeal, we note that Georgia law entitled the mother to legal representation, including court-provided counsel if she were found indigent, and Georgia law required the juvenile court to ascertain that the mother was aware of this right. Former OCGA § 15-11-6 (b). A waiver of this statutory right to counsel must be both knowing and voluntary, *In the Interest of B. B.*, 267 Ga. App. 360, 362 (2) (599 SE2d 304) (2004), and it must be made on the record. *In the Interest of J. M. B.*, 296 Ga. App. 786, 789 (676 SE2d 9) (2009). Proceedings that might lead to the termination of a parent-child relationship also can implicate due process concerns. See generally *Lassiter v. Dept. of Social Svcs.*, 452 U. S. 18, 31-32 (II) (C) (101 SCt 2153, 68 LE2d 640) (1981) (adopting standards for determining whether due process entitled parent to counsel in termination proceeding).

The instant case offers an example of the significant, detrimental effect of a parent's lack of counsel in deprivation proceedings. In the earlier proceeding the mother, without benefit of counsel, stipulated that the child was deprived, that the attendant circumstances (such as alleged cutting behavior) constituted deprivation, and that the child could be removed from her care for up to a year. These stipulations have limited to some degree the arguments the mother has been able to make in later stages of the proceedings, including in this appeal. In fact, the state has emphasized

hearing.) On June 6, 2013, the juvenile court entered the above-mentioned unappealed deprivation order that adjudicated J. C. deprived based on four causes: "Perpetration of Domestic Violence"; "Neglect/Lack of Supervision"; "Neglect/Inadequate Housing"; and "Mental/Physical Impairment of Parent." The juvenile court ruled that the mother would retain legal custody and control of J. C. provided that she "comply with the family plan devised by [DFCS[2]] and follow all recommendations and referrals to service providers, including, but not limited to: counseling recommended by [a particular service provider], parenting classes, clean and suitable housing and psychiatric evaluation[.]" The juvenile court held that the aunt would have physical custody of J. C. "until such time as the mother complies with the terms of [the juvenile court's order]" and that "[p]hysical custody of the child shall not return to the mother without prior order of this [c]ourt." The order further stated that it would "expire on May 14, 2014, unless sooner terminated by [o]rder of this [c]ourt."

---

the mother's stipulations in its appellate arguments, asserting that, "about six months prior to the hearing on [DFCS's] motion to transfer custody, [the mother] had stipulated to the fact that J. C. was deprived due to her mental instability and consented to placing him in the physical custody of his maternal aunt."

[2] This family plan is not in the appellate record.

6

The mother did not appeal from this deprivation ruling. We note, however, that the juvenile court lacked the authority to award physical custody of the child to a person other than the child's legal custodian. See *In the Interest of A. N.*, 281 Ga. 58, 59-61 (636 SE2d 496) (2006) (juvenile court addressing issue of temporary custody was not authorized to impose upon grant of legal custody a condition that physical custody be given to a party of the court's choosing, because the concept of legal custody includes the right to determine where and with whom child shall live); *In re R. R. M. R.*, 169 Ga. App. 373, 374-375 (1) (312 SE2d 832) (1983) (juvenile court addressing issue of temporary custody was not authorized to grant one person or agency legal custody of child and another person or agency physical custody of child).

Consequently, in the summer of 2013 J. C. remained living with the aunt and initially the mother lived in her truck. She briefly lived with a pimp but denied prostituting for him. She then moved into an agency-operated shelter. The mother began parenting classes and obtained employment, but in August 2013 she sustained an injury that prevented her from working.

On August 16, 2013, a licensed psychologist performed a four-hour psychological/parental fitness evaluation on the mother. The mother was very candid

in their interview. She related that she was the victim of childhood sexual abuse, had a history of prostitution, and had a history of difficult relationships with abusive partners. She told the psychologist that she smoked marijuana and consumed two alcoholic drinks a day. She described a criminal history (a burglary conviction with a probated sentence and first offender status ) and a history of cutting behavior as a teenager that she resumed after the argument with the aunt.

The mother told the psychologist that she had completed parenting classes and that she had begun anger management classes but had not returned because she did not like the others in the class and because the leader had said she did not need the classes. The mother appeared to the psychologist to be amenable to therapy and making an effort with it.

The psychologist administered several tests to the mother. These tests reflected that she had an IQ on the lower end of average but not low enough to mentally impair her and that she had a high probability for substance abuse and self-medication. She scored high on tests for trauma, anxiety, depression, and suicidal ideation. Her score on a child abuse potential inventory reflected that she had personality characteristics in common with "people who have typically abused a child." She scored low on an inventory of parenting aspects, and although she had a reasonable understanding of

child rearing and parenting principles, the mother's expressed intention of using corporal punishment rather than time-outs to discipline J. C. in the future concerned the psychologist, in light of her other test scores.

Based on his interview and the test results, the psychologist diagnosed the mother with various mental disorders that, in his opinion, affected her functioning and required immediate treatment. He recommended that J. C. not be returned to his mother's care and that she have only supervised contact with him until a therapist deemed her ready for unsupervised contact.

After receiving the psychologist's report, in October 2013, DFCS petitioned to transfer temporary legal custody of J. C. from the mother to the aunt. The mother, at that point represented by counsel, moved to dismiss the petition and for a return of physical custody to her.

On December 10, 2013, the juvenile court held an evidentiary hearing, at which the psychologist testified to the findings from his August 2013 evaluation. As detailed below, various other witnesses testified to actions that the mother had taken since the juvenile court's earlier deprivation finding.

A DFCS case manager testified at the hearing that DFCS had developed a case plan[3] for the mother that set goals for her to continue counseling, attend anger management classes, follow the psychologist's recommendations, and obtain an evaluation from a licensed psychiatrist. The case manager described her knowledge of the mother's progress in these areas: the mother was in the initial phases of individual counseling, she had not finished anger management classes but had expressed her intent to attend a series of classes that had not yet begun, and she had not yet had a psychiatric evaluation. The case manager explained that the mother was responsible for finding her own psychiatrist and that DFCS had not referred the mother to a psychiatrist. The case manager also testified that the mother was working with a new service provider; the new provider had not given DFCS information about the mother's progress and DFCS had not given the new provider the psychologist's August 2013 evaluation.

The DFCS case manager met with the mother regularly. She testified that, at the time of the hearing, the mother was on medical leave from employment and that in September 2013 she had moved into a three-bedroom trailer that was clean and had

---

[3] It is not clear if this is the "family plan" to which the juvenile court referred in his earlier deprivation order; in any event, this plan is not part of the appellate record.

room for J. C.; she received help in paying her rent and utilities from the agency that operated the shelter where she had stayed. The mother lived alone in the trailer, although sometimes she would have friends visit; the mother introduced her friends to the case manager using nicknames, and the case manager did not know whether or not the mother knew the friends' actual names. The mother had visits with J. C. that were arranged and supervised by the aunt.

The case manager testified that, at some point during the late summer of 2013, a fire erupted while the mother was cooking at the aunt's house. The mother told the case manager that she had momentarily entertained the thought of letting the house burn down but, realizing that J. C. would not have a place to stay, she called the fire department.

When asked why DFCS sought the transfer of temporary custody from the mother to the aunt, the case manager responded: "I feel that Mom is not making any behavior change in regards to her parenting skills or her child's well being." She noted that the mother blamed others for DFCS's involvement and had never lived with J. C. on her own. The case manager testified that the mother had stated she did not intend to continue a relationship with J. C. if the aunt was given custody of the boy.

11

The aunt testified at the hearing that J. C. was living with her, that the mother visited J. C. regularly, and that the mother attended doctor appointments with the boy. The aunt had discretion over the visitation schedule. The relationship between the aunt and the mother was strained, and the aunt testified that the mother had laughed about the household fire incident. However, the aunt helped the mother move into her new residence, which the aunt described as livable and clean. The aunt opined that the mother was unable to care for J. C., noting that the mother had never taken care of the boy without help from others, she was "not stable," and she socialized with undesirable people.

The juvenile court heard testimony from an employee of the agency that operated the shelter where the mother had lived in the summer of 2013 and from which the mother continued to receive support. This witness testified that the mother had begun parenting classes, had found stable housing, and had begun individual counseling. She testified that she had seen improvements in the mother's ability to manage anger, noting that the mother had "been through a lot that makes people angry" and describing, as an example of the mother's improved skills in this area, an incident "where a resident [of the shelter] tried to actually fight with her, and instead

of fighting with the other resident [the mother] came and told the staff and tried to resolve the situation." In the agency employee's opinion, the mother had "evolved."

A witness who had become a close friend of the mother in the summer of 2013 testified that she spent time with the mother every day, provided her with some financial assistance, and regularly took her to therapy and counseling appointments. She stated that the mother was scheduled to begin anger management classes. Although the mother spoke about her past cutting behavior, the friend saw no evidence of current cutting. The friend had observed the mother interact with J. C. at doctor appointments and the aunt's house, and she described the two as having a loving bond. The friend testified to changes she had observed in the mother between the summer of 2013 and the hearing in December 2013. Initially the mother had been very angry, but the witness had seen the mother's personal growth. She had witnessed the mother get frustrated without losing her temper. The friend testified: "[S]he is a very loving person. She has a good heart. She . . . did have trust issues but now she has grown to the point that she does trust. And that's why I feel like with her that she's more like a daughter than just a friend." The friend stated that the mother had a positive support system that included her, the family violence agency employee, and

a relative. She testified to her belief that the mother was capable of taking care of J. C. and she committed to help the mother to that end.

The mother testified at the hearing that, since moving out of the aunt's house, she had completed parenting classes and begun counseling. Because J. C. did not live with her, she was not presently eligible for an in-home parenting class. She had an appointment for a psychiatric evaluation set for several days after the hearing and was taking prescribed medication for depression. She had registered for a series of anger management classes that would begin the following month, and she also was scheduled to begin substance abuse treatment. The mother presented photographs of her three-bedroom trailer home, in which she had placed a crib and other items for J. C. The mother admitted to one instance of cutting behavior since J. C.'s birth. She admitted to smoking marijuana and described obtaining the drug from strangers outside of convenience stores. Another witness who administered a drug test to the mother testified that she had tested positive for marijuana and cocaine.

At the end of the hearing, the psychologist, who had listened to all of the testimony, returned to the stand and testified that the mother "appears [to be] in a very similar situation" as she was when he evaluated her four months earlier, if not a worse situation due to the positive drug test, although he acknowledged that the mother had

developed a support network and begun taking medication for her psychological conditions. He had not had further contact with the mother after the August 2013 evaluation, and he testified that he did not "know for sure" whether her parental fitness had improved or her scores would have changed on the assessment tests he had previously administered. The psychologist testified that he had concerns about J. C. being returned to his mother's care because, without counseling, the mother's condition would not improve. He also testified that the aunt should not supervise contact between the mother and J. C.

On March 5, 2014, the juvenile court entered the order at issue on appeal. In that order, the juvenile court found that J. C. remained deprived "as previously found by this [c]ourt on May 14, 2013, [and] that the [m]other has not yet remedied her issues that resulted in a deprivation finding in May 2013[.]" The juvenile court denied the mother's motion to dismiss and her motion for a return of physical custody, and instead transferred temporary legal custody of J. C. from the mother to the aunt. The mother appeals from this order.

2. *Present deprivation.*

As stated above, for a transfer of even temporary legal custody of J. C. from the mother to the aunt, DFCS was required to show by clear and convincing evidence that

J. C. was presently deprived. See *In the Interest of G. S.*, 279 Ga. App. at 91. In his March 5, 2014, order the juvenile court found J. C. deprived because the mother had not remedied the causes of deprivation identified in the earlier deprivation order. See generally *In the Interest of M. T. F.*, 318 Ga. App. 135, 145-146 (1) (733 SE2d 432) (2012) (where child is not in parent's physical custody, DFCS may show present deprivation by showing that, if child were returned to parent at time of hearing, child would be deprived). Those causes were: "Perpetration of Domestic Violence"; "Neglect/Lack of Supervision"; "Neglect/Inadequate Housing"; and "Mental/Physical Impairment of Parent." We must view the earlier, unappealed deprivation order as establishing that those causes of deprivation existed at the time of the earlier order. See *In the Interest of P. D. W.*, 296 Ga. App. 189, 192 (1) (a) (674 SE2d 338) (2009) (unappealed order adjudicating child deprived binds parent to finding that at time of order child was deprived for reasons given therein). Present deprivation "may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist[ed] at the time of the termination hearing." *In the Interest of M. T. F.*, 318 Ga. App. at 146 (1) (citations omitted).

The appellate record, however, offers little meaningful insight into the conditions giving rise to the prior deprivation findings, which the juvenile court

16

entered after a hearing at which the mother stipulated to deprivation without the benefit of counsel. The paucity of the record on this point hampers our ability to determine whether there is evidence that those conditions still existed at the time of the deprivation ruling at issue in this appeal. As detailed below, the record, as it exists, does not contain clear and convincing evidence to support the trial court's conclusion that, in December 2013, J. C. remained presently deprived.

(a) *Perpetration of domestic violence.*

The record does not contain clear and convincing evidence that the mother had continued to perpetrate domestic violence. To begin with, the record does not clearly identify the victim of the domestic violence that the juvenile court found the mother to have perpetrated in the May 2013 order. That order refers to the argument between the mother and the aunt and also states that the mother had yelled at the infant J. C., but the order does not describe any acts of violence and the aunt made clear in her later testimony that her argument with the mother was not physical but was "just words."

Regardless of the identity of the victim of the domestic violence initially found by the juvenile court, the record contains no evidence whatsoever that the mother had continued to perpetrate domestic violence against anyone. At the time of the

17

December 2013 hearing, the mother lived alone, there is no evidence that she was involved in a romantic or sexual relationship with anyone, and there is no evidence that she had engaged in any violent acts whatsoever toward the aunt, toward J. C., or toward any other person. At most, the evidence showed that when the household fire erupted the mother briefly entertained the thought of letting the house burn down but did not act on this thought. Even if the mother's initial thought regarding the fire could be construed as an act of "domestic violence," it was a single incident that does not support a finding of present deprivation. See *In the Interest of H. B.*, 324 Ga. App. 36, 38 (1) (749 SE2d 38) (2013) (single incident of domestic violence did not demonstrate deprivation).

(b) *Neglect/lack of supervision.*

The record does not contain clear and convincing evidence that, in December 2013, J. C. was deprived due to lack of supervision. The record does not describe the circumstances that the juvenile court found to constitute lack of supervision in the spring of 2013, and consequently we cannot determine whether there was evidence that those circumstances still existed. Similarly, although the psychologist's August 2013 written report included "neglect of child – perpetrator" as one of his diagnostic impressions of the mother, neither his report nor his testimony identified the specific

18

circumstances that resulted in that diagnosis, and thus we cannot determine if those circumstances persisted in December 2013.

The juvenile court's order also does not explain how the mother would fail to supervise J. C. if he were returned to her care. The order included some factual findings critical of the mother's previous lifestyle, including her cutting behavior, the time she spent with undesirable persons, and her working as a prostitute. But we discern from the record "no evidence of abuse or abandonment," *In the Interest of E. M.*, 264 Ga. App. 277, 281 (590 SE2d 241) (2003) (citations omitted), and the juvenile court did not explain whether or how the mother's earlier behaviors would lead to a failure to supervise the boy. Cf. *In the Interest of D. E. K.*, 236 Ga. App. 574, 577-578 (512 SE2d 690) (1999) (evidence of, among other things, mother's transitory lifestyle, previous drug use, and relationship with abusive husband did not amount to clear and convincing evidence that child was deprived, where uncontroverted evidence showed that mother had cared for child to best of her ability and child's basic physical, mental, and emotional needs had been met). Moreover, there was no evidence that these behaviors persisted at the time of the hearing. While the juvenile court noted that the mother had left the aunt's house with J. C. in inclement weather (the act that apparently led to the involvement of DFCS), there was no evidence that

19

this was anything other than an isolated episode or that J. C. suffered any emotional or physical harm from it. See *In the Interest of H. B.*, 324 Ga. App. at 38 (1). Finally, while the juvenile court's order stressed the mother's continued drug use and the fact that she obtained marijuana from strangers, again there was no evidence that her drug use caused J. C. any emotional or physical harm. See *In the Interest of M. L. C.*, 249 Ga. App. 435, 437 (2) (548 SE2d 137) (2001) (reversing finding of deprivation and transfer of temporary custody where there was "little evidence of record indicating how the parents' drug use affected [the child]").

However, there was evidence that the mother was taking steps to care for J. C.'s needs by establishing an appropriate residence, accompanying him on doctor visits, and attending parenting classes. See *In the Interest of G. S.*, 279 Ga. App. at 93 (noting evidence that mother was taking steps to care for child's needs, including scheduling dental and medical appointments, in finding there was not clear and convincing evidence of deprivation). Under these circumstances, there was not clear and convincing evidence that J. C. was presently deprived due to the mother's failure to supervise him.

(c) *Neglect/inadequate housing.*

The record does not contain clear and convincing evidence that, in December 2013, the mother had inadequate housing for J. C. To the contrary, the undisputed evidence showed that the mother had obtained suitable housing in the form of a three-bedroom trailer that was clean and livable and contained necessities for the child. See *In the Interest of E. M.*, 264 Ga. App. at 281.

(d) *Mental/physical impairment of parent.*

In both its appellate brief and at oral argument the state emphasized the mother's alleged mental impairment as the primary reason to affirm the juvenile court's ruling. Even if we were to find clear and convincing evidence sufficient to sustain the juvenile court's finding of deprivation caused by mental impairment, that evidence would not support affirming the judgment. The erroneous findings of the juvenile court discussed above would necessitate a remand. See *In the Interest of E. R. D.*, 172 Ga. App. 590 (323 SE2d 723) (1984) (after setting aside as clearly erroneous a finding of the juvenile court that the record did not support, reversing a deprivation order and remanding it to the juvenile court for further proceedings because the appellate court could not "determine whether the juvenile court would have found clear and convincing evidence of deprivation based upon the remaining evidence before it") (citation and punctuation omitted). But as detailed below, the

record does *not* contain clear and convincing evidence sufficient to support mental impairment as a cause of present deprivation.

In determining whether a child is a "deprived child" under former OCGA § 15-11-2 (8) (A), a court may consider "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." Former OCGA § 15-11-94 (b) (4) (B) (i). See *In the Interest of C. D. E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001). Although the psychologist opined that the mother had "significant health issues that could negatively affect her ability to parent," for several reasons we find that his opinion was not clear and convincing evidence that the mother had a medically verifiable mental health deficiency of such duration or nature as to render her unable to provide adequately for J. C.

The psychologist's opinion did not establish how his diagnostic impressions of the mother related to a finding that the child was deprived. See id. As to many of the diagnostic impressions, there was "no discussion of how [they were] relevant to the mother's ability to parent her child." *In the Interest of K. S.*, 271 Ga. App. 891, 893 (611 SE2d 150) (2005). While the psychologist's written report contained a list

22

of "significant issues impairing [the mother's] ability to parent," neither the list nor the psychologist's testimony about that list demonstrated the necessary link between a verifiable mental health deficiency and an inability to provide adequately for the child. The psychologist "did not . . . testify as to the effect of the [mother's conduct] on [J. C.] or state that [he] had been harmed by his [mother's] actions . . . at any other time [and he] gave no specific example of the effect of [the mother's] behavior on the child." *In the Interest of C. L. Z.*, 283 Ga. App. 247, 248 (641 SE2d 243) (2007) (reversing deprivation finding). Compare *In the Interest of M. E.*, 265 Ga. App. 412, 416-417 (1) (593 SE2d 924) (2004) (clear and convincing evidence authorized juvenile court to find child deprived based upon mother's lack of mental ability to care for child where mother's multiple mental health diagnoses had manifested in her fixating on idea that father had abused child, in her repeatedly taking child to health care providers with unsubstantiated claims of sexual abuse, in her possibly having harmed child in order to support abuse allegations, and in her having emotionally abused child by failing to control anger).

Some of the items on the significant issues list – for example, that the mother has been "[d]iagnosed with Intermittent Explosive Disorder" – merely restated diagnostic impressions without addressing whether or why these conditions were of

such duration or nature as to render the mother unable to parent. Some of the items on the significant issues list – for example, that the mother had an "[i]ncomplete case plan"[4] – did not necessarily follow from any of the specific diagnostic impressions. Some of the items on the significant issues list – for example, that the mother had "[n]o place of her own" and had "[e]ngag[ed] in prostitution while caring for her child" – either directly conflicted with or were not supported by the evidence of record; the undisputed evidence showed that by the time of the hearing the mother did have her own housing, and while there was evidence that the mother had prostituted herself before J. C. was born and briefly had lived with a pimp after the juvenile court removed J. C. from her care, there was no evidence that she had prostituted herself during any time when the child was in her care. The psychologist admitted at the hearing that he did not know when the prostitution had occurred. Despite the

---

[4] It is important to note that the "case plan" to which the psychologist referred – which is not in the record – could not have been a reunification plan, because at the time the child was in the legal custody of the mother. In any event, at the time the psychologist identified "incomplete case plan" as a significant issue, no more than a few months had passed since the plan's development, and there was undisputed evidence at the hearing that the mother had actively worked toward the plan's goals. Cf. *In the Interest of J. H.*, 310 Ga. App. 401, 403-404 (713 SE2d 472) (2011) (reversing juvenile court's determination that child was deprived where, among other things, there was "no evidence that [mother's] failure to readily accept [DFCS's] advice and assistance resulted in any harm to [the child]").

24

incompleteness and inaccuracy of the lists found in the psychologist's written report, the juvenile court repeated much of them verbatim in his final order as findings of fact supporting the conclusion that J. C. was deprived. See generally *In the Interest of C. D. E.*, 248 Ga. App. at 763 (2) (juvenile court's inclusion in order of allegations unsupported by evidence suggests that court's ultimate conclusion that children were deprived was based on a flawed view of facts).

Even more significantly, the concerns that the psychologist raised in his written report and emphasized in his hearing testimony centered primarily on the mother's past experiences and possible future actions, not on her present ability to care for J. C. The psychologist testified that his "two biggest concerns" were the mother's "ability to control herself from hurting [J. C. and] her previous tendency to pick abusive people to be with." But a transfer of even temporary custody from a parent must be due to *present* deprivation. *In the Interest of G. S.*, 279 Ga. App. at 92. Evidence of a parent's past conduct and the possibility of future deprivation does not support a transfer of custody. See *In the Interest of G. R. B.*, 330 Ga. App. 693, 701 (769 SE2d 119) (2015) (concern over risk that parents – who had troubled, violent relationship – might reunite in future was not evidence of present deprivation); *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 770 (1) (684 SE2d 29) (2009) (while

"courts may consider past conduct when determining whether deprivation is likely to continue, . . . a finding of parental unfitness must be based on present circumstances") (citation and punctuation omitted). See generally *In the Interest of C. D. E.*, 248 Ga. App. at 765-766 (2) (distinguishing between future risk and present danger). This is particularly true where, as here, there is no showing of any previous physical or emotional harm to the child. See *In the Interest of H. S.*, 285 Ga. App. 839, 842 (648 SE2d 143) (2007) (reversing award of temporary custody from father to other relatives; despite some evidence of instance of domestic violence between parents, there was no evidence that child suffered any emotional or physical harm). Compare *In the Interest of T. S.*, 310 Ga. App. 100, 103 (1) (712 SE2d 121) (2011) (finding sufficient evidence of deprivation where mother, who was in anger management counseling, twice previously had injured children, and psychologist working with mother testified that it was unwise to return children to her until she sought further counseling); *In the Interest of R. M.*, 276 Ga. App. 707, 716 (624 SE2d 182) (2005) (while children's future risk of contracting tuberculosis from parents might not have constituted deprivation under different circumstances, where another child in the household already had died from the disease and parents nevertheless had refused to comply with treatment to mitigate risk, there was evidence of present deprivation).

26

Consequently, the mother's history of choosing abusive partners, and the psychologist's concern that she might choose another abusive partner in the future, did not demonstrate J. C.'s present deprivation. See *In the Interest of C. D. E.*, 248 Ga. App. at 761-762 (1) (possibility that mother, who was a past victim of domestic violence, might enter into another abusive relationship in the future was not a ground for taking custody of child away from her). Likewise, the psychologist's concerns that the mother's psychological makeup and past childhood trauma might predispose her to harm J. C. in the future did not support a finding of present deprivation, where there was no evidence that the mother had ever actually harmed the child. See id. at 765-767 (2) (reversing deprivation finding despite psychologist's report that father, who had a bipolar diagnosis, was a "walking time bomb" who presented a risk of danger to his children).

The psychologist also testified that he was concerned that the mother's drug use would impair her ability to parent J. C., stating that "if you have trouble controlling your anger and you're high, then that's a major issue[.]" But again, the psychologist based this recommendation on a concern that the mother might harm J. C. in the future, although there was no evidence that she had at any time harmed the

27

child in connection with her drug use. See *In the Interest of M. L. C.*, 249 Ga. App. at 437 (2).

Without question, the evidence, including the psychologist's opinion, depicted a mother who is struggling with significant mental and emotional challenges. But "[t]he right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances." *In the Interest of G. S.*, 279 Ga. App. at 94 (citation and punctuation omitted). The evidence in this case showed that the mother had never physically or emotionally harmed her child and that she was working to overcome her mental and emotional challenges. A concern – however well-founded – that she might not succeed in overcoming those challenges simply did not establish by clear and convincing evidence the present deprivation required to remove the child from her custody. Accordingly, we reverse the order transferring temporary legal custody of J. C. from the mother to the aunt. (In doing so, we note that the earlier order giving physical custody to the aunt has expired.)

*Judgment reversed. Dillard, J., concurs*; *Ellington, P. J., concurs in the judgment only.*